Dr. Lenora B. FULANI, Lenora B. Fulani's Committee for Fair Elections, and Virginia Sinclair, Plaintiffs–Appellants,

v.

LEAGUE OF WOMEN VOTERS EDUCATION FUND, League of Women Voters of the United States, League of Women Voters of the City of New York Education Fund, Inc., James Baker, III, Secretary of the Treasury, and Roscoe Egger, Jr., Commissioner of Internal Revenue, Defendants–Appellees.

No. 728, Docket 88–6243.

United States Court of Appeals,
Second Circuit.

Argued Jan. 31, 1989.

Decided Aug. 2, 1989.

---

Arthur R. Block, New York City, for plaintiffs-appellants.

Brooksley Born, Washington, D.C. (Arnold & Porter, Washington, D.C., of counsel), for defendants-appellees League of Women Voters Educ. Fund; League of Women Voters of the U.S.; and League of Women Voters of the City of New York Educ. Fund, Inc.

Paul K. Milmed, Asst. U.S. Atty., New York City (Rudolph W. Giuliani, U.S. Atty. S.D.N.Y., Nancy Kilson, Asst. U.S. Atty., of counsel), for Federal defendants-appellees.

Before VAN GRAAFEILAND, CARDAMONE, and PIERCE, Circuit Judges.

PIERCE, Circuit Judge:

Appellants appeal from so much of a judgment of the United States District Court for the Southern District of New York (Sweet, J.) as denied their motion to compel the government to revoke appellees' tax-exempt status under 26 U.S.C. § 501(c)(3).[1] We hold that appellant Fulani did have standing to challenge the tax-exempt status of appellees. However, since we agree with the district court that appellant failed to prevail on the merits, the judgment of the district court is affirmed.

## BACKGROUND

Appellant Dr. Lenora B. Fulani was an independent and minor party candidate for President of the United States during the 1988 national elections.[2] Appellee League of Women Voters Education Fund ("the League") is a tax-exempt, not-for-profit charitable organization whose stated goals are to foster voter education and participation in the electoral process. In 1988, the League organized and sponsored three nationally-televised primary debates; two involved contenders for the Democratic Party's presidential nomination and one brought together contenders for the Republican Party's nomination. Each of these debates focused on these respective candidates' quest for state delegates' votes via local primary contests. Dr. Fulani attempted to procure an invitation to participate in these debates, however, the League did not invite her to take part in any of them. The League stated that its decision was based on the fact that Fulani

was not seeking the nomination of either the Democratic or the Republican Party.

On March 14, 1988, before any of the debates had taken place, Fulani sued the League,[3] the Secretary of the Treasury, and the Commissioner of Internal Revenue in federal district court, seeking, *inter alia*, injunctive and declaratory relief. This appeal arises out of Dr. Fulani's unsuccessful attempt in that litigation to enjoin the League from holding any presidential primary debates without inviting her to participate therein on equal terms with the other candidates, and to compel the federal defendants to revoke the League's tax-exempt status under Internal Revenue Code ("I.R.C.") section 501(c)(3).

Section 501(c)(3) of the Internal Revenue Code provides for the exemption from federal income taxation of organizations operated exclusively for charitable or educational purposes, no part of the net earnings of which inures to the benefit of any private shareholder or individual. *See Association of the Bar of the City of New York v. Commissioner*, 858 F.2d 876, 877 (2d Cir. 1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 1768, 104 L.Ed.2d 204 (1989). Furthermore, charitable contributions to an organization which enjoys section 501(c)(3) status are tax-deductible to the donor for federal income, estate, and gift tax purposes. 26 U.S.C. §§ 170(a)(1), 170(c)(2)(D), 2055(a)(2), 2106(a)(2)(A)(ii), and 2522(a)(2). To remain eligible for the tax benefits available to such organizations, however, the organization must not "participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of (or in opposition to) any candidate for public office." I.R.C.

---

1. The decision of the district court is reported at 684 F.Supp. 1185 (S.D.N.Y.1988). The named plaintiffs in the district court action were Dr. Lenora B. Fulani, Dr. Fulani's principal campaign organization the Committee for Fair Elections, and Virginia Sinclair, a member of the League of Women Voters who supported Dr. Fulani's candidacy.

2. Two ways in which a presidential candidate can gain access to the general election ballot in a state if he or she is not the nominee of either the Democratic or Republican Party are: (1) by

collecting enough petition signatures to have his or her name placed on the ballot as an "independent," or (2) by winning the nomination of a "minor" party that has obtained a position on the ballot in that state.

3. The League of Women Voters of the United States and the League of Women Voters of the City of New York Education Fund, Inc., were also named as defendants in this action. For purposes of this appeal, the League defendants are collectively referred to as "the League."

§ 501(c)(3), *as amended by* Omnibus Budget Reconciliation Act of 1987, Pub.L. No. 100–203, § 10711, 101 Stat. 1330, 1330–464. In other words, the organization must remain strictly "nonpartisan" in its endeavors. *See* Rev.Rul. 78–248, 1978–1 C.B. 154; Rev.Rul. 86–95, 1986–2 C.B. 73; *Association of the Bar of the City of New York,* 858 F.2d at 880.

In connection with her attempt to compel the revocation of the League's tax-exempt status, appellant Fulani contended in the district court that the League had engaged in impermissible "partisan" activity when it denied her the right to participate in the Democratic and Republican primary debates. More specifically, Fulani claimed that the League had structured the debate phase of its primary election voter education program in such a way as to favor the two traditional major parties, and to exclude significant independent and minor party candidates such as herself.

After a hearing and upon considering the merits of plaintiffs' contentions, Judge Sweet denied the plaintiffs' motion for injunctive and declaratory relief, and dismissed all except one of the remaining ancillary claims, which was later voluntarily withdrawn by the plaintiffs. On appeal, Fulani reiterates her contention that the League engaged in "partisan" activity when it refused to allow her to participate in the 1988 Democratic and Republican primary debates, and urges that, consequently, the League's tax-exempt status under I.R.C. § 501(c)(3) should be revoked. Appellees assert that Fulani's contentions are baseless, and that, in any event, appellants lack standing to challenge the government's tax treatment of the League. For the reasons stated herein, we affirm the district court's decision rejecting appellants' attempt to compel the revocation of the League's tax-exempt status.

## DISCUSSION

### A. *Standing*

As a threshold matter, we must determine whether Fulani has standing to maintain this action. Although the district court explicitly chose not to reach this issue, it is fundamental that "Article III of the Constitution confines the federal courts to adjudicating actual 'cases' and 'controversies.'" *Allen v. Wright,* 468 U.S. 737, 750, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984). If Fulani fails to satisfy the basic threshold standing requirements, then as a general principle, we are without jurisdiction to entertain this appeal. *See Warth v. Seldin,* 422 U.S. 490, 498–99, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975) (whether a plaintiff "has made out a 'case or controversy ... within the meaning of Article III ... is the threshold question in every federal case, determining the power of the court to entertain the suit.").

The Supreme Court instructs us that there are three "core component[s]" to apply in assessing Article III standing. A plaintiff must allege: (1) a "personal injury" that is (2) "fairly traceable to the defendant's allegedly unlawful conduct," and (3) which is "likely to be redressed by the requested relief." *Allen,* 468 U.S. at 751, 104 S.Ct. at 3324. Moreover, the injury must be "'distinct and palpable,'" *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 100, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979) (quoting *Warth,* 422 U.S. at 501, 95 S.Ct. at 2206), and not "'abstract'" or "'conjectural'" or "'hypothetical.'" *Allen,* 468 U.S. at 751, 104 S.Ct. at 3324 (citations omitted). Applying these concepts in determining whether there is standing in a given case often can be a difficult task. Typically, the examining court should conduct its standing inquiry with the following questions in mind: "Is the injury too abstract, or otherwise not appropriate, to be considered judicially cognizable? Is the line of causation between the illegal conduct and injury too attenuated? [And] [i]s the prospect of obtaining relief from the injury as a result of a favorable ruling too speculative?" *Allen,* 468 U.S. at 752, 104 S.Ct. at 3325. These are the principal questions which guide our inquiry in this case.

The League and the federal defendants have presented three basic arguments in support of their claim that Fulani lacks standing to maintain this action. First, the

appellees contend that Fulani has not suffered a judicially cognizable injury. Second, the appellees assert that Fulani's alleged injury is too speculative and remote to be "fairly traceable" to either her exclusion from the League's debates or the tax-exempt status of the League. And, finally, the appellees claim that even if Fulani did suffer a " 'distinct and palpable' " injury, that injury is incapable of being redressed by the relief she seeks since the 1988 presidential elections are now past history. Although we ultimately agree with appellees that Fulani's section 501(c)(3) claims were appropriately dismissed on the merits, we disagree with appellees' contention that, as a threshold matter, Fulani lacked standing to compel the revocation of the League's tax-exempt status.

In arguing lack of standing, appellees point out that federal courts have frequently rejected attempts by litigants to challenge the tax-exempt status of third parties. *See, e.g., Allen,* 468 U.S. 737, 104 S.Ct. 3315; *Simon v. Eastern Ky. Welfare Rights Org.,* 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976); *see also American Soc'y of Travel Agents v. Blumenthal,* 566 F.2d 145 (D.C.Cir.1977), *cert. denied,* 435 U.S. 947, 98 S.Ct. 1533, 55 L.Ed.2d 546 (1978); *Khalaf v. Regan,* 85–1 U.S. Tax Cases (CCH) ¶ 9269 (D.D.C.1985), *aff'd,* No. 85–5274 (D.C.Cir. Sept. 19, 1986). Appellees rely on these cases to support their contention that Fulani lacks standing to compel the federal defendants to revoke the League's tax-exempt status. However, we find this case to be distinguishable from the cited cases because Fulani's asserted injury is both "judicially cognizable" and "fairly traceable" to the conduct of appellees.[4]

▆▆ Reading Fulani's complaint in the most favorable light, as we are bound to do at this stage of the proceedings, *Warth,* 422 U.S. at 501, 95 S.Ct. at 2206, the prohibited conduct challenged by Fulani is the continued grant of a tax exemption by the IRS to an organization which allegedly engaged in "partisan" activities, in contravention of I.R.C. § 501(c)(3). According to Fulani, by allowing the League to continue to enjoy its section 501(c)(3) status, the IRS unlawfully encouraged and permitted the League of Women Voters to promote indirectly certain political parties and candidates over others during the critical primary phase preceding the general election. Specifically, Fulani contends that "the federal defendants have distorted the political process by permitting the tax subsidy and privileged status of 501(c)(3) exemption to be used to favor the campaigns of Democratic and Republican party candidates in the presidential election, and to disadvantage the campaign of [herself] and her supporters." Fulani claims that as a significant political aspirant for the presidency, she was directly injured by the League's refusal to include her in the subject nationally-televised primary debates because she lost critical media exposure and any competitive advantage which might have flowed from her participation in those debates, and because she was deprived of the opportunity to communicate her political ideas to the electorate on equal terms with other significant presidential candidates.

It is important to note at this point that Fulani does not claim the League was obligated to include in these debates every individual who had announced his or her candidacy for the presidency. As the League pointed out in the district court, at the time this litigation was commenced, approximately 280 individuals had filed statements with the Federal Election Commission ("FEC") indicating that they considered themselves to be candidates for the office of President. Fulani contends that the League was obligated to use *non-partisan* criteria in deciding whom to include and exclude from the debates. For instance, under the League's existing eligibility rules for the debates, once a candidate had demonstrated that he was a member of either the Democratic or Republican Party, the League then used the "significance" of an individual's candidacy as a means of

---

**4.** Since we hold that Dr. Fulani did have standing, and must therefore address the merits herein, we need not—and do not—pass on whether the other appellants also had standing.

limiting the number of Democrats and Republicans who could appear in the debates. The League did not, however, examine the "significance" of a candidate *until* that person satisfied the League's threshold party affiliation requirement. For purposes of determining Fulani's standing to challenge whether the League's use of such a requirement was inconsistent with its section 501(c)(3) status, we accept Fulani's contention that she was a "significant" candidate in this election, and that she therefore would have been included in the League's debates if she had been a member of either the Democratic or Republican Parties.

We believe Fulani has alleged an injury in fact which satisfies the first prong of the standing analysis. In this era of modern telecommunications, who could doubt the powerful beneficial effect that mass media exposure can have today on the candidacy of a significant aspirant seeking national political office. The debates sponsored by the League were broadcast on national television, watched by millions of Americans, and widely covered by the media. It is beyond dispute that participation in these debates bestowed on the candidates who appeared in them some competitive advantage over their non-participating peers. *See* 1 R. Bauer & D. Kafka, *United States Federal Election Law* ch. 2, at 29 (1984) (major party competitors in candidate debates receive "substantial media exposure without charge," which "surely constitute[s] a benefit of considerable value" to them, at the expense of nonmajor party candidates); *cf. Johnson v. F.C.C.,* 829 F.2d 157, 165 (D.C.Cir.1987) ("[petitioners'] inclusion in the televised debates undoubtedly would have benefited their campaign"). In our view, the loss of competitive advantage flowing from the League's exclusion of Fulani from the national debates constitutes sufficient "injury" for standing purposes, because such loss palpably impaired Fulani's ability to compete on an equal footing with other significant presidential candidates. To hold otherwise would tend to diminish the import of depriving a serious candidate for public office of the opportunity to compete equally for

votes in an election, and would imply that such a candidate could never challenge the conduct of the offending agency or party. *See Anderson v. Celebrezze,* 460 U.S. 780, 792, 103 S.Ct. 1564, 1572, 75 L.Ed.2d 547 (1983) (Ohio statute impermissibly burdened the campaign efforts of independent candidates by making "[v]olunteers ... more difficult to recruit and retain, [and] media publicity and campaign contributions ... more difficult to secure"); *Common Cause v. Bolger,* 512 F.Supp. 26, 30–31 (D.D.C.1980) (three-judge court) (candidates and campaign participants had standing to challenge franking statute which allegedly conferred unlawful benefit on incumbents seeking reelection, on grounds that granting subsidy to incumbents taints the political process and renders it unfair). *See generally* 1 R. Bauer & D. Kafka, *supra,* ch. 2, at 28–30 (discussing generally problems which arise when nonmajor candidates are excluded from candidate debates).

We must, then, turn to the second and overlapping area of inquiry, the question whether the subject injury is "fairly traceable" to the conduct of the appellees. Both the League and the federal defendants first assert that Fulani's alleged injury—*i.e.,* the loss of her ability to compete on an equal footing with the other candidates—is too "remote" and "speculative" to be fairly traceable to their conduct, because her eventual loss of the 1988 presidential election cannot fairly be attributed to her exclusion from the League's primary debates. In so arguing, the defendants rely on the D.C. Circuit's decision in *Winpisinger v. Watson,* 628 F.2d 133 (D.C.Cir.), *cert. denied,* 446 U.S. 929, 100 S.Ct. 1867, 64 L.Ed.2d 282 (1980), wherein the court held that supporters of Senator Edward Kennedy's effort to win the 1980 presidential nomination of the Democratic Party lacked standing to challenge President Carter's alleged use of federal funds and public authority to promote his own renomination.

In *Winpisinger,* the court rejected the plaintiffs' claims on the ground that Senator Kennedy's inability to obtain the Demo-

cratic Party nomination could not fairly be attributed to the alleged misconduct of members of President Carter's administration and reelection committee, given the "endless number of diverse factors potentially contributing to the outcome of state presidential primary elections, caucuses and conventions." 628 F.2d at 139. We find *Winpisinger* inapposite, however, because Fulani's alleged injury is much less attenuated than the injuries asserted therein.

In terms of judicial assessment of injury for standing purposes, we find the analysis in *Common Cause v. Bolger* to be persuasive. In *Bolger*, candidates alleged that the federal franking statute, which effectively granted small subsidies to the reelection campaigns of incumbent officials, was unconstitutional because it impaired the new contenders' ability to compete with incumbent candidates on equal terms. Finding that the plaintiffs had standing to sue, the court stated:

> This dispute over standing boils down to a dispute over the role of ... elections in our political system. If the purpose of campaigns is only to elect candidates, then defendants' and intervenor's arguments concerning causation and resultant lack of standing might have some weight. [National] campaigns, however, serve other purposes besides electing particular candidates to office. They are also used to educate the public, to advance unpopular ideas, and to protest the political order, *even if the particular candidate has little hope of election*. The First Amendment most certainly protects political advocacy of this type, and infringements of these rights can occur regardless of the success or failure of a particular candidate at the polls.

512 F.Supp. at 32 (emphasis added). Fulani's injury does not derive solely from the fact that she ultimately failed to win the presidency in 1988. Rather, the asserted harm also flows from the League's and the federal government's allegedly partisan restriction of her opportunities to communicate her political ideas to the voting public at large. That is the essence of the judicially cognizable injury which Fulani has asserted, and, on the facts of this case, that is the injury which we find "fairly traceable" to her exclusion from the League-sponsored debates. *See also Illinois Elections Bd. v. Socialist Workers Party*, 440 U.S. 173, 186, 99 S.Ct. 983, 991, 59 L.Ed.2d 230 (1979) ("[A]n election campaign is a means of disseminating ideas as well as attaining political office.... Overbroad restrictions on ballot access jeopardize this form of political expression.").

■ The federal defendants next assert that even if Fulani can attribute her injuries to her exclusion from the debates, that injury cannot be fairly traced back to the IRS's tax treatment of the League. In several of the recent federal court cases cited by appellees, *supra*, which address challenges to the tax-exempt status of an organization, it was indeed the lack of any nexus, or causal connection, between the tax-exempt status of the organization whose conduct was being challenged and the alleged injuries of the plaintiffs which led the courts to find lack of standing. *See, e.g., Allen v. Wright*, 468 U.S. at 757, 104 S.Ct. at 3327–28; *Simon*, 426 U.S. at 40–43, 96 S.Ct. at 1925–27; *American Soc'y of Travel Agents*, 566 F.2d at 149–50. Herein, appellants concede that ordinarily it is difficult to trace a judicially cognizable injury to the government's tax treatment of a particular organization, because so often it borders on "pure speculation" to assert that withdrawal of the tax exemption would cause independent third parties to change their allegedly discriminatory conduct. *See Allen*, 468 U.S. at 757–59, 104 S.Ct. at 3327–29; *Simon*, 426 U.S. at 42–46, 96 S.Ct. at 1926–28. Appellants point out, however, that the facts of this case render any such "speculation" unnecessary, because there is an evident nexus between the government's tax treatment of the League and the claimed injury.

As the government itself concedes, the League of Women Voters Education Fund in effect would have been prohibited under relevant Federal Election Commission regulations from sponsoring *any* candidate debates if the League's 501(c)(3) tax-exempt status had been withdrawn at the time

appellant Fulani sought to compel revocation of that status. *See* 11 C.F.R. §§ 110.-13, 114.4(e) (1988) (narrow regulatory exception for nonpartisan debates sponsored by § 501(c)(3) "staging organizations"); *see also* 1 R. Bauer & D. Kafka, *supra*, ch. 2, at 28–30. *But for* the government's refusal to revoke the League's tax-exempt status, then, the League, as a practical matter, would have been unable to sponsor the allegedly partisan debates which caused the injury of which Fulani complains. In light of the fact that 501(c)(3) status is in practice a prerequisite to League sponsorship of candidate debates under FEC regulations, we conclude that there is a nexus between the federal defendants' tax treatment of the League and Fulani's asserted injuries which enables Fulani to trace her injury directly back to such federal defendants' tax treatment of the League.[5]

■ Next, we must examine the "redressability" prong of the standing analysis, namely, whether there is a "causal connection between the alleged injury and the judicial relief requested." *Allen*, 468 U.S. at 753 n. 19, 104 S.Ct. at 3325 n. 19. We think it rather clear that Fulani's asserted injuries could have been redressed by the relief she sought, since, practically speaking, revocation of the League's tax-exempt status at least would have prevented the League's sponsorship of the debates, from which Fulani claims she was wrongfully excluded. This being so, Fulani has met the third part of the standing test.[6]

■ Finally, in a slight variation of their failed "redressability" argument, appellees also argue, albeit indirectly, that Fulani's claims are "moot" because the presidential election is now over. We find these arguments wholly without merit, since "[t]he issues properly presented, and their effects on minor-party candidacies, will persist in future elections, and within a time frame too short to allow resolution through litigation. This is, therefore, a case where the controversy is 'capable of repetition, yet evading review.'" *Johnson v. F.C.C.*, 829 F.2d 157, 159 n. 7 (D.C.Cir.1987) (quoting *Storer v. Brown*, 415 U.S. 724, 737 n. 8, 94 S.Ct. 1274, 1282 n. 8, 39 L.Ed.2d 714 (1974) (quoting *Southern Pac. Terminal Co. v. ICC*, 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911))); *see also Honig v. Doe*, 484 U.S. 305, 108 S.Ct. 592, 601–04, 98 L.Ed.2d 686 (1988). Accordingly, we find that appellant Fulani's claims are not moot, and that she has satisfied all three of the applicable standing requirements.

### B. *The League's Allegedly Partisan Conduct*

■ Although we find that Fulani has alleged sufficient injury to satisfy the standing requirements, her claim on the merits fails. The League's exclusion of Fulani from the primary debates it sponsored during the early part of 1988, on the facts presented herein, did not constitute partisan activity in contravention of its tax-exempt status under I.R.C. § 501(c)(3).

---

5. The concurring opinion argues that Fulani's alleged injury could be termed "fairly traceable" to the government's actions *only* if "the government's conferral of the tax exemption *caused* the League to hold the debates from which Fulani was excluded." (Emphasis in original.) This proposition seems to go beyond *Simon v. Eastern Kentucky Welfare Rights Organization*, upon which it rests, and beyond traditional standing analysis. The point that the Court was making in *Simon* was not that the tax exemption had to directly cause the alleged injury, but rather that many other factors—aside from the tax exemption—may well have contributed to plaintiffs' alleged injury. Thus, held the Court, the injury was not fairly traceable to the tax exemption. 426 U.S. at 41–46, 96 S.Ct. at 1925–28. Here, in contrast, the causal chain is far more clearly drawn because in practice the interlocking frameworks of Internal Revenue

Code provisions and FEC regulations severely narrow the League's latitude of discretion.

6. In the concurrence, it is urged that Fulani fails the redressability prong of the standing analysis. The concurrence argues that the requested relief would not redress Fulani's weakness as a candidate, and that the "playing field [will] remain[ ] tilted regardless of what we do." This, however, seems to raise the requirement of redressability too high. For the redressability prong to be met, the courts need not be able to level the "playing field" between the actors involved; instead, there need only be a substantial likelihood that the relief requested will have a substantial ameliorative effect on the specific injury alleged. *See generally Allen*, 468 U.S. at 753 n. 19, 104 S.Ct. at 3325 n. 19; *Simon*, 426 U.S. at 45–46, 96 S.Ct. at 1927–28.

At the outset, we agree with Fulani that the prohibition against partisan activity in section 501(c)(3) bars more than the partisan promotion of certain candidates over other candidates, and we agree that an organization's selective promotion of certain *parties* over others would be inconsistent with its section 501(c)(3) tax-exempt status. *See Association of the Bar of the City of New York*, 858 F.2d at 879, 880 (" '[t]he prohibition on political campaign activities [in I.R.C. § 501(c)(3) ] ... reflect[s] Congressional policies that the U.S. Treasury should be neutral in political affairs' ") (quoting from H.R.Rep. No. 391, 100th Cong., 1st Sess. 1621, 1625 (1987), *reprinted in* 1987 U.S.Code Cong. & Admin.News 2313–1, 2313–1201, 2313–1205). Herein, however, appellant Fulani's contention that the League engaged in partisan activity when it limited participation in the primary debates it sponsored to members of either the Democratic or Republican Party is without merit. In assessing whether the League's inclusion of only Democratic and Republican candidates in its primary debates was "partisan," we must first consider the context in which that limitation was made, and then examine that action in light of the claims advanced by appellants.

It is of critical importance that the subject debates were not *general election* debates. Rather, they were *primary season* debates, sponsored by the League in an effort to educate the electorate about the candidates who were vying for the nomination of either the Republican or the Democratic Party. While primary contests are, in a broad sense, an integral part of the whole presidential election process, they also serve an important function in our current electoral system separate and distinct from that served by the general presidential election contest which occurs quadrennially in November.

Most often, presidential primary elections are state-wide political party contests among candidates who seek to garner the commitment or support of delegates who select that party's nominee for President during the national party's political convention. Primary contests, then, are essentially *intra-party* competitions. Although such candidates are members of the same party, each may have a separate political agenda for the party's future, and they present themselves to those who are eligible to vote in the primary as the candidate who will best represent the party in the general election. *See Nader v. Schaffer*, 417 F.Supp. 837, 844 (D.Conn.) (three-judge court), *aff'd mem.*, 429 U.S. 989, 97 S.Ct. 516, 50 L.Ed.2d 602 (1976).

The League of Women Voters Education Fund historically has sponsored primary debates during presidential election years in an effort to educate voters about relevant issues and about candidates seeking to become party nominees. As discussed, in 1988 the League sponsored three separate debates for the significant candidates who were seeking either the Democratic Party or the Republican Party nomination. In each of these intra-party debates, the League provided candidates with a forum to debate each other so that those eligible to vote might decide which candidate could best represent the Democratic or Republican *Party* in the upcoming general election. By bringing together in one forum the significant candidates for the Democratic Party's presidential nomination and, in another forum, the significant candidates for the Republican Party's presidential nomination, the League's Board endeavored to help voters and supporters make an informed choice when time came to vote in the Republican and Democratic primary contests. It is against this backdrop that we must assess Fulani's claims. Appellants do not argue that the League failed to provide contending independent and minor-party candidates with an opportunity to debate issues and present candidates germane to their own respective nominating processes equal to that afforded the major parties, and therefore we need not address this issue. Instead, Fulani contends that, as a "significant" independent and minor-party presidential candidate, she was entitled to, and should have been provided with, an opportunity to engage the candidates for the *Republican* and *Democratic* Party nominations in a multi-party dialogue about issues of national concern.

In so arguing, Fulani has miscast the purpose of the primary phase of national elections. As discussed, primary elections are an "internal mechanism" by which parties resolve intra-party differences prior to party nominating conventions, if any, and prior to the general election, and they are the mechanism by which parties select "standard bearers" to represent them in the upcoming general election. *See Storer v. Brown*, 415 U.S. 724, 735, 94 S.Ct. 1274, 1281, 39 L.Ed.2d 714 (1974) ("contending forces within the party employ the primary campaign and primary election to finally settle their differences"). Fulani's attack on the League's primary voter education program essentially blurs the distinctions between the primary phase and the general election phase of the contest for the presidency, insofar as Fulani sought to compel the League to convert its "primary season" voter education program into a "general election" program for educating voters about *inter-party* differences. At least for purposes of deciding this appeal, we believe the distinctions between the primary and general election phases of the presidential contest are legitimate and proper ones to draw.

Given the goals underlying the primary phase of the presidential election contest— *i.e.,* to resolve intra-party disputes and select among competing candidates—it becomes clear that the League's limiting of the debates to Republican and Democratic Party candidates was not "partisan," and thus was not in contravention of I.R.C. § 501(c)(3). Rather, it was a logical consequence of the nature and role of primary contests in the electoral process. There has been no contention in this appeal that the League improperly excluded significant minor parties in designing its primary voter education program, only that the League improperly excluded Fulani as a single significant candidate from the subject debate forum. Fulani, however, was neither a candidate nor a participant in either of the primary contests that were the subject of the League's challenged voter education program. Since Fulani was not competing in either of those primary contests, it was

not improper for the League to exclude her from the three debates in issue.

## CONCLUSION

We have considered all of the other arguments raised on appeal and find them to be without merit. The League's exclusion of appellant from its primary season debates did not constitute "partisan" activity in contravention of I.R.C. § 501(c)(3). The decision of the district court is therefore affirmed.

CARDAMONE, Circuit Judge, concurring:

Because appellant has not satisfied the Article III requirements for standing the district court lacked subject matter jurisdiction over this suit. Thus, I am unable to concur in the majority's otherwise cogent discussion of the merits.

In my view, the majority has misapprehended the import of *Allen v. Wright,* 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984) and *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976) (*Eastern Kentucky*). It is undisputed that a plaintiff must satisfy each of the three requirements of injury in fact, traceability and redressability before the strictures of the Article III standing requirements are met. *See Allen v. Wright,* 468 U.S. at 751, 104 S.Ct. at 3324; *Eastern Kentucky,* 426 U.S. at 41, 96 S.Ct. at 1925. Even assuming *arguendo* that Fulani has stated a judicially cognizable injury, she has nonetheless failed to establish standing's causal prongs of traceability and redressability.

Traceability assesses the "causal connection between the assertedly unlawful conduct and the alleged injury...." *Allen v. Wright,* 468 U.S. at 753 n. 19, 104 S.Ct. at 3325 n. 19. In its discussion of the traceability requirement, the majority asserts that "*[b]ut for* the government's refusal to revoke the League's tax-exempt status, then, the League, as a practical matter, would have been unable to sponsor the debates which caused the injury of which Fulani complains." *Supra* at 628 (emphasis in original). Invocation of more than

the phrase "but for" is needed to link plaintiff's injury to the defendants' conduct. Although § 501(c)(3) status is arguably a Federal Election Commission prerequisite to candidate debate sponsorship, that does not, in and of itself, connect the defendants' putative violation of § 501(c)(3) to Fulani's diminished ability to compete in the political arena. All Fulani's complaint establishes is that the government's assertedly illegal conduct *allowed* the League to act in a way that may have injured her; she does not allege that the IRS has provided an incentive for the League to engage in partisan acts. To satisfy the traceability requirement, plaintiff must allege that the government's conferral of the tax exemption *caused* the League to hold the debates from which Fulani was excluded, which was the source of her asserted injury. *Cf. Eastern Kentucky*, 426 U.S. at 42–43, 96 S.Ct. at 1926 (stating that it did not follow from assertion that an IRS ruling " 'encouraged' hospitals to deny services to indigents" that "the denial of access to hospital services in fact *result[ed] from* " defendant's conduct.) (emphasis added).

Further, appellant cannot attribute her injury to the defendants' conduct because the recipient of the purportedly illegal governmental benefit—the League—is not in competition with Fulani; only the major party candidates compete with her in the political arena. Because whatever injury Fulani has suffered is traceable to the Democratic and Republican candidates, who are not defendants in this action, appellant has failed to meet the traceability requirement and has therefore no standing to bring suit. *Cf. Eastern Kentucky*, 426 U.S. at 41, 96 S.Ct. at 1925 ("[I]njury at the hands of a hospital is insufficient by itself to establish a case of controversy in the context of this suit, for no hospital is a defendant.").

*Winpisinger v. Watson*, 628 F.2d 133, 139 (D.C.Cir.) (per curiam), *cert. denied*, 446 U.S. 929, 100 S.Ct. 1867, 64 L.Ed.2d 282 (1980) is instructive. The court there held that supporters of Senator Edward Kennedy's presidential nomination bid lacked standing to complain that members of President Jimmy Carter's cabinet and reelection committee had promoted his reelection by allegedly illegally using federal funds and by abusing the power of incumbency. Fulani's traceability argument is even more attenuated than that proffered by the *Winpisinger* appellants—litigants whose direct competitors were the same parties who had allegedly broken the law. Nonetheless, the court held that "[t]he endless number of diverse factors potentially contributing to the outcome of ... elections ... forecloses any reliable conclusion that voter support of a candidate is 'fairly traceable' to any particular event." *Id.* Because standing was properly denied in *Winpisinger*, it follows, *a priori*, that it should also be denied here.

Moreover, appellant has not satisfied the final requirement of standing inquiry, that of redressability. This prong focuses on the causal connection between the injury plaintiff alleges and the judicial relief sought. *Allen v. Wright*, 468 U.S. at 753 n. 19, 104 S.Ct. at 3325 n. 19. Fulani's asserted injury is her competitive disadvantage as a candidate vis-à-vis major-party candidates who—unlike her—were invited to participate in the League's televised debates. The principal relief she seeks is injunctive: Restraining the League from conducting a debate to which she is not invited, or ordering the IRS to revoke the League's tax exempt status. Neither of these remedies will cure the alleged injury. Consequently, it would violate core values underlying Article III standing requirements and separation of powers doctrine to allow her to invoke the power of the judiciary to right a wrong that does not flow from defendants' actions. This is particularly true where, as here, we are asked to tell the executive branch whom it should prosecute for tax violations; in essence, advise it how it should implement the laws. *See Allen v. Wright*, 468 U.S. at 759–60, 104 S.Ct. at 3328–29; *Linda R.S. v. Richard D.*, 410 U.S. 614, 619, 93 S.Ct. 1146, 1149, 35 L.Ed.2d 536 (1973).

The relief sought appears to redress Fulani's injury only if one ignores the Article III "aspect of standing [that] reflects a due regard for the autonomy of those persons

likely to be most directly affected by a judicial order." *Valley Forge Christian College v. Americans United For Separation of Church and State, Inc.,* 454 U.S. 464, 473, 102 S.Ct. 752, 759, 70 L.Ed.2d 700 (1982). It seems to me that Fulani has underestimated the autonomy that the League would retain regardless of our holding in this case, and that she has overestimated the coercive powers that would flow from her requested relief. Additionally, as is the case whenever a plaintiff complains about the IRS' tax treatment of another person or entity, appellant's prospects for redress from a judicial order are diminished by the independent actions of parties not before us. Therefore, even were appellant were to obtain the remedy she seeks, the League could exercise options other than inviting her to its debates, and her injury would therefore remain unredressed.

For example, rather than abide by the terms of our injunction, the League might decide to discontinue its hosting of Presidential debates and stop such sponsorship altogether. *Cf. Eastern Kentucky,* 426 U.S. at 43, 96 S.Ct. at 1926 (stating that rather than treating more indigents and thereby redressing plaintiffs' injury, "it is just as plausible that the hospitals to which respondents may apply for service would elect to forgo favorable tax treatment to avoid the undetermined financial drain of an increase in the level of uncompensated services."). If the League ceases sponsoring debates, Fulani would still be denied the media exposure she seeks. Of course, the major party candidates—Fulani's competitors—would also lose the free television time the debates provide and would thereby seem to be placed at a similar disadvantage with her. But those candidates already have the legitimacy that she seeks, and those were the criteria employed when the League invited them to debate in the first place. The point is that the playing field remains tilted regardless of what we do because, as indicated in the traceability discussion, it was not the League that tilted it.

The speculative nature of the majority's inquiry is of concern because even were Fulani's preferred scenario to come true and the League were to sponsor a debate to which she would be invited, the Democratic and Republican Parties—who as non-parties to this litigation are beyond the scope of the court's remedial powers—could decline the League's invitation. *Cf. Allen v. Wright,* 468 U.S. at 759, 104 S.Ct. at 3328–29 (stating that how the parents of children in the private schools whose tax status was at issue would respond to a change in the school's tax status was speculative). In fact, during the last general presidential election, the Democratic and Republican Parties did supplant the League by forming the "Commission on Presidential Debates," that is, a bipartisan organization which undertook the sponsorship and staging functions heretofore carried out by the League. Thus, the credibility that Fulani seeks from debating with better-known candidates falls beyond the scope of relief that we have the power to grant.

Finally, there are those third-parties for whose votes appellant competes: Television viewers and voters. With due respect to appellant, it strikes me as sheer conjecture to attribute their apparent rejection of her candidacy to any actions taken by the defendants.[1] *See Winpisinger,* 628 F.2d at 139; *see also Allen v. Wright,* 468 U.S. at 759, 104 S.Ct. at 3329 (holding that the causal connection was too weak to support standing because it "involves numerous third parties ... whose independent decisions may not collectively have a significant effect" on achieving plaintiff's goal of desegregated education).

The foregoing hypotheticals are concededly speculative, but the majority also

---

1. Fulani might respond by asserting that winning is not the issue, and that she merely wants the IRS and the League to stop breaking the law and thereby to cease distorting the political process. But if Fulani so conflates her injury to rectify the attenuated nature of her causation arguments, then my assumption for purposes of discussion of causation that Fulani had stated a judicially cognizable injury would be untenable. *See Schlesinger v. Reservists Committee to Stop the War,* 418 U.S. 208, 217, 94 S.Ct. 2925, 2930, 41 L.Ed.2d 706 (1974).

engages in conjecture when it posits what results might flow from its holding, "practically speaking." Such conjecture, the Supreme Court teaches, is fatal to plaintiff's standing to maintain this action. *See Allen v. Wright*, 468 U.S. at 758–59, 104 S.Ct. at 3328; *Linda R.S. v. Richard D.*, 410 U.S. at 618, 93 S.Ct. at 1149. The minimum requirements of Article III are not satisfied by the "remote possibility" that Fulani's opportunity for election would have been better had defendants acted differently, and might improve if a court rules in her favor. *See Warth v. Seldin*, 422 U.S. 490, 507, 95 S.Ct. 2197, 2209, 45 L.Ed.2d 343 (1975).

Accordingly, though I concur with the disposition of this appeal, it is on the separate grounds that Fulani's complaint should be dismissed for lack of subject matter jurisdiction for lack of standing.