# United States Court of Appeals
## For the First Circuit

---

No. 00-2124

HEIDI BECKER, ET AL.,

Plaintiffs, Appellants,

v.

FEDERAL ELECTION COMMISSION,

Defendant, Appellee.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Patti B. Saris, U.S. District Judge]

---

Before

Torruella, Chief Judge

Lynch and Lipez, Circuit Judges.

---

Scott P. Lewis, with whom Palmer & Dodge, John C. Bonifaz, Gregory G. Luke, Brenda Wright, and National Voting Rights Institute were on brief, for appellants.
Stephen E. Hershkowitz, Assistant General Counsel, with whom Lawrence M. Noble, General Counsel, Richard B. Bader, Associate General Counsel, and David Kolker, Holly J. Baker, and Erin K. Monaghan, Attorneys, were on brief, for appellee.

**LYNCH, Circuit Judge**.  Presidential candidate Ralph Nader and others assert that the prohibition in the Federal Election Campaign Act on the use of corporate money "in connection with" federal elections invalidates certain  Federal Election Commission regulations governing the funding of presidential debates.  Those regulations permit corporations to make contributions from their general treasuries to qualified nonprofit, nonpartisan organizations staging federal candidate debates.  Suit was brought in anticipation of the debates to be staged by the Commission on Presidential Debates (CPD) before the November 2000 Presidential Election.  The district court dismissed Nader's claims on the merits and entered judgment on September 14, 2000.  Nader appealed and this court granted expedited review.  We hold, contrary to the FEC,  that we have Article III jurisdiction and, contrary to Nader, that the plaintiffs' facial challenge to the debate regulations fails.

**I.**

With the 2000 presidential debates on the horizon, Nader, nominee of the Green Party, together with organizations supporting his campaign, as well as both supportive and uncommitted individual voters, brought this action on June 19, 2000 in the United States District Court for the District of Massachusetts. The plaintiffs challenge as ultra vires two FEC regulations, 11 C.F.R. §§ 110.13 and 114.4(f), which allow qualified nonprofit, nonpartisan organizations to accept corporate donations in staging presidential debates and allow corporations to make such donations. The plaintiffs claim that the regulations violate a provision of the Federal Election Campaign Act, 2 U.S.C. §§ 431 et seq. , which makes it unlawful for a corporation to make any "contribution or expenditure in connection with" the presidential elections. Id. § 441b(a). The Act defines "contribution or expenditure" to include "any direct or indirect payment . . . or gift of money, or any services, or anything of value . . . to any candidate, campaign committee, or political party or organization." Id. § 441b(b)(2).

On June 29, the plaintiffs moved to preliminarily enjoin the FEC from implementing the challenged regulations and

-3-

requested that the district court order the FEC to enforce the FECA's prohibition on corporate contributions so as to prevent corporate sponsorship of the presidential debates. The FEC moved to dismiss for lack of jurisdiction, arguing that none of the plaintiffs could demonstrate Article III standing and that the plaintiffs had failed to exhaust their administrative remedies.

After holding oral argument on both motions on August 14, 2000, the district court on September 1 denied the FEC's motion to dismiss, concluding that Nader and the Green Party had standing to challenge the FEC's debate regulations[1] and that plaintiffs were entitled to review because the futility exception to the exhaustion requirement of the Administrative Procedure Act applied. The court denied plaintiffs' motion for a preliminary injunction, however, finding no likelihood of success on the merits, on the basis that the regulations were based on a reasonable interpretation of the FECA entitled to deference under Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984).

---

[1]    The district court found that the individual voter plaintiffs lacked standing.

-4-

On September 6, the district court entered final judgment in accordance with a stipulation of the parties, and plaintiffs filed a motion for expedited review in this court, which the FEC opposed. We granted plaintiffs' motion on September 26, 2000, ordered expedited briefing, and heard oral argument on October 5.

## II.

We first address the FEC's argument that plaintiffs have failed to exhaust their administrative remedies. Like the district court, we think the plaintiffs are not required to petition the FEC before bringing a facial challenge to the agency's regulations. Because the FECA itself has no provisions governing judicial review of FEC regulations, the judicial review procedures of the Administrative Procedure Act, 5 U.S.C. §§ 701 et seq., apply to a facial challenge to the FECA's implementing regulations. See Perot v. FEC, 97 F.3d 553, 560-61 (D.C. Cir. 1996); Faucher v. FEC, 743 F. Supp. 64, 68 (1990), aff'd 928 F.2d 968 (1st Cir. 1991). The FEC has steadfastly maintained that these debate regulations are valid and there is no point in requiring plaintiffs to go through exhaustion. See

Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997); Brown v. Secretary of HHS, 46 F.3d 102, 113-14 (1st Cir. 1995).

## III.

We next consider whether the plaintiffs have standing. Standing doctrine involves "a blend of constitutional requirements and prudential considerations." Valley Forge Christian Coll. v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 471 (1982). The constitutional component of standing stems directly from Article III's limitation of federal judicial power to deciding justiciable cases or controversies. See Allen v. Wright, 468 U.S. 737, 751 (1984).[2] To establish standing, it does not suffice for plaintiffs to show merely that they bring a justiciable issue before the court; they must show further that they have a sufficiently personal stake in the issue. This means that plaintiffs must show: (1) that they have suffered or are in danger of suffering some injury that is both concrete and particularized to them; (2) that this injury is fairly traceable to the allegedly illegal conduct of the defendant; and (3) that

---

[2] The FEC makes no claim that the plaintiffs have failed to meet prudential standing requirements.

a favorable decision will likely redress the injury.  See <u>Valley</u>

<u>Forge</u>, 454 U.S. at 472; <u>see also</u> <u>Vote Choice, Inc.</u> v. <u>DiStefano</u>,

4 F.3d 26, 36 (1st Cir. 1993).  We first determine whether Nader

has standing; we then turn to the voter plaintiffs.

## A.  Whether Nader Has Standing

Nader argues that the FEC regulations allowing

corporate sponsorship of the presidential debates have injured

him by making corporate contributions available to his opponents

(in the form of free television exposure during the debates)

when such contributions are not available to him.  Consequently,

Nader has been put at a competitive disadvantage in the

presidential race, and as a result he has had to alter his

campaign strategy and spend more on advertising in order to

compensate for this disadvantage.

The FEC's central counterargument is that the injuries

Nader alleges are not fairly traceable to the FEC regulations

he challenges.  Nader's standing theory is misplaced, the FEC

contends: while it might be true that Nader's exclusion from the

debates puts him at a competitive disadvantage, Nader is not

challenging his exclusion from the debates.  As plaintiffs state

in their brief: "This is a lawsuit about the <u>funding</u> of

presidential debates, not a challenge to the rules governing participation in debates."  Moreover, Nader concedes that, even if FEC regulations did not allow corporate sponsorship of the debates, the debates would likely be held anyway, with funding coming from public sources or the media; and Nader makes no claim that in such event he would have a better chance of being invited to participate.  Thus Nader has failed to show, the FEC concludes, that there is a causal nexus between corporate sponsorship of the debates and the injuries he alleges as his basis for standing.

In reply, Nader argues that there is such a causal nexus.  At the time that he brought this suit, Nader still stood a chance of being invited to participate in the debates.  Yet if he were invited, he says, he would be forced to decline the invitation due to his principled stand against accepting corporate contributions.  The consequences of this Faustian dilemma, he argues, suffice for standing: not only did it create the potential injury of having to cede to his opponents the advantage of free television exposure, but it also forced him presently to conduct his campaign and make advertising expenditures on the assumption that no such exposure would be

available to him.  In this sense, corporate sponsorship threatened to exclude him from the debates and had a palpable and immediate impact on his campaign strategy and expenditures.

In support of his position, Nader cites Vote Choice, Inc. v. DiStefano, 4 F.3d 26, 36 (1st Cir. 1993).  In that case, Elizabeth Leonard, a Rhode Island gubernatorial candidate, challenged a state campaign finance law requiring all candidates, at the time they declared their candidacies, to choose whether to accept public funding for their campaigns. The law at issue attached certain benefits to the acceptance of public funding, such as free air time on community television and higher caps on campaign contributions.  See id. at 29-30. Leonard chose to decline public funding and thereby to forego the accompanying benefits.  As a result, this court held, she had standing.  Given Leonard's choice not to accept public funding, the law put her at a potential disadvantage as to any publicly funded opponents she might face, forcing her to structure her campaign to anticipate and offset that disadvantage.  See id. at 36-37.  "In our view," we held, "such an impact on the strategy and conduct of an office-seeker's

political campaign constitutes an injury of a kind sufficient to confer standing."  <u>Id.</u> at 37.

Nader argues, and the district court agreed, that his case is analogous: given Nader's choice not to accept corporate contributions, the FEC's regulations allowing corporate sponsorship of the debates effectively bar him from participating even if he qualifies for an invitation.  He is thus put at a potential disadvantage in the event that he is invited and forced by his principles to decline the invitation; and he suffers a consequent present harm, in that he has been forced to structure his campaign to offset this potential disadvantage -- e.g., by spending more on advertising than he would if there remained a chance that he could appear in the debates.

While the question is close, we find that Nader does have standing under <u>Vote Choice</u>.  Nader has been and continues to be a significant candidate in the 2000 presidential race.  At the time he brought this suit,[3] it was a genuinely open question

---

[3]     A footnote in the concurring opinion suggests that we might err in assessing Nader's standing from this chronological point of reference; it points to a Tenth Circuit case, <u>Powder River Basin Resource Council</u> v. <u>Babbitt</u>, 54 F.3d 1477 (10th Cir.

whether he would be invited to the debates: Nader brought suit

---

1995), holding that a plaintiff must not only have standing at the time he brings suit, but must retain it throughout the litigation. The case has rightly been criticized for ignoring language in <u>Lujan</u> v. <u>Defenders of Wildlife</u>, 504 U.S. 555 (1992), clearly indicating that standing is to be "assessed under the facts existing when the complaint is filed." <u>Klamath Siskiyou Wildlands Ctr.</u> v. <u>Babbitt</u>, No. CV-99-1044-ST, 2000 U.S. Dist. LEXIS 2269, at *9 (D. Or. Feb. 15, 2000) (quoting <u>Lujan</u>, 504 U.S. at 571, n.4). The problem with the approach taken in <u>Powder River</u> is that it conflates questions of standing with questions of mootness: while it is true that a plaintiff must have a personal interest at stake throughout the litigation of a case, such interest is to be assessed under the rubric of standing at the commencement of the case, and under the rubric of mootness thereafter. <u>See, e.g.</u>, <u>Steger</u> v. <u>Franco, Inc.</u>, No. 99-2294, 2000 U.S. App. LEXIS 24818, at *7 (8th Cir. Oct. 3, 2000) ("[S]tanding is based on the facts as they existed at the time the lawsuit was filed."); <u>White</u> v. <u>Lee</u>, Nos. 99-15098, 99-15109, and 99-16033, 2000 U.S. App. LEXIS 23778, at *81 (9th Cir. Sep. 27, 2000) (same); <u>Advanced Mgmt. Tech., Inc. v. FAA</u>, 211 F.3d 633, 636 (D.C. Cir. 2000) (same); <u>see also</u> <u>Gwaltney of Smithfield, Ltd.</u> v. <u>Chesapeake Bay Found., Inc.</u>, 484 U.S. 49, 69 (Scalia, J., concurring) ("Subject matter jurisdiction depends on the state of things at the time of the action brought; if it existed when the suit was brought, subsequent events cannot oust the court of jurisdiction.") (internal quotation marks and citations omitted). "The confusion is understandable, given [the Supreme Court's] repeated statements that the doctrine of mootness can be described as 'the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness).'" <u>Friends of the Earth, Inc.</u> v. <u>Laidlaw Envtl. Servs. (TOC), Inc.</u>, ___ U.S. ___, 120 S.Ct. 693, 708-09 (2000) (citations omitted). But questions of standing and questions of mootness are distinct, and it is important to treat them separately. <u>See</u> <u>id.</u> at 709-10. We address whether Nader's claim is moot below.

in June 2000; the CPD's first determination of which candidates would be invited to the debates was scheduled for Labor Day; within that time, it was certainly possible that Nader would be able to meet the CPD's eligibility threshold of a fifteen-percent showing of support in the national polls.  Nader thus reasonably claims that, at the time he brought suit, corporate sponsorship of the debates loomed as a potential stumbling block in the path of his campaign, which forced him to make significant adjustments to his campaign strategy and use of funds.[4]  "[W]e see nothing 'improbable' about the proposition," and we do not think it proper to second-guess a candidate's reasonable assessment of his own campaign.  See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., ___ U.S. ___,

---

[4]     The concurrence argues that Nader's injury is "overly speculative," and that our granting him standing effectively "grants standing to any political entrant to challenge any election regulation to which they might someday be subject." Infra, at ___ (emphasis added).  Our holding is nowhere near so broad.  Nader was not merely "any political entrant" in the presidential race.  At the time he brought suit, he could have plausibly hoped to qualify for an invitation to the debates. Nor did he merely worry that "someday" corporate sponsorship of the debates would interfere with his campaign.  At the time of filing, invitations to the debates were scheduled to be determined at a definite date, soon enough in the future to affect his present campaign plans.

120 S.Ct. 693, 706 (2000) (finding standing to turn on the reasonableness of plaintiffs' fear that defendant's conduct would interfere with their activity). We similarly granted credence in Vote Choice to plaintiff Leonard's claim that she had to adjust her campaign to account for the possibility of facing a publicly funded opponent, even though in the end that possibility did not materialize. Vote Choice, 4 F.3d at 37; see also Vote Choice, Inc. v. DiStefano, 814 F. Supp 195, 204 (D.R.I. 1993). To probe any further into these situations would require the clairvoyance of campaign consultants or political pundits -- guises that members of the apolitical branch should be especially hesitant to assume.

The FEC attempts to distinguish Vote Choice from this case on the grounds that the plaintiff in Vote Choice was directly subject to the law she challenged: the law specifically required all candidates to choose whether to accept public funding. By contrast, the FEC regulations in question here regulate not candidates, but rather debate staging organizations, such as the CPD, and their corporate donors. Thus, the FEC argues, the regulations could not possibly have put Nader to a "coerced choice," as was at issue in Vote Choice,

-13-

see 4 F.3d at 37, simply because the regulations do not apply to Nader at all. In short, the argument goes, the plaintiff's choice in Vote Choice was coerced by law, while Nader's choice is wholly self-imposed.

The FEC's formalistic distinction, however, does not withstand scrutiny. The FEC regulations Nader challenges allow the CPD to accept corporate funds; the CPD's acceptance of corporate funds in turn presents Nader with a choice of whether to participate in corporate-sponsored debates. Thus, but for the regulations, Nader would not be coerced to make the choice. Granted, the coercion wrought by the regulations is indirect, but that makes no difference; the choice is still fairly traceable to the regulations. Cf. Fulani v. League of Women Voters, 882 F.2d 621, 628 (2d Cir. 1989) (finding candidate's exclusion from debates traceable to government's refusal to revoke League's tax-exempt status, where "[b]ut for the government's refusal . . . the League, as a practical matter, would have been unable to sponsor [the debates]").[5] Moreover,

_____

[5] Similarly flawed is the FEC's argument that Nader cannot claim standing on the basis that he has been put at a competitive disadvantage in the presidential race. The FEC cites a line of Second Circuit decisions in which competitive

-14-

this is not a case like <u>Lujan</u> v. <u>Defenders of Wildlife</u>, 504 U.S. 555 (1992), where the agency is alleged to have unlawfully regulated a third party, and the plaintiff's standing depends on an unpredictable question of whether the third party will use its discretion under the regulation so as to harm the plaintiff. See <u>id.</u> at 562. In this case, whether the CPD will choose to accept corporate funds to help stage the 2000 presidential debates is not unpredictable; the CPD had already chosen to do so by the time Nader brought suit.[6]

---

disadvantage in a political race has been recognized as a possible basis for standing, but only where the plaintiff has shown "that he personally competes in the same arena with the party to whom the government has bestowed the assertedly illegal benefit." <u>In re United States Catholic Conference</u>, 885 F.2d 1020, 1029 (2d Cir. 1989), <u>quoted in</u> <u>Fulani</u> v. <u>Bentsen</u>, 35 F.3d 49, 54 (2d Cir. 1994); <u>see also</u> <u>Gottlieb</u> v. <u>FEC</u>, 143 F.3d 618, 620-21 (D.C. Cir. 1998); <u>Fulani</u> v. <u>Brady</u>, 935 F.2d 1324, 1327 (D.C. Cir. 1991). The FEC argues that Nader cannot claim such standing, because he does not compete in the same arena with the CPD, which is the party to whom the FEC has bestowed the assertedly illegal benefit of access to corporate funding. Again, however, such argument unjustifiably ignores the consequences of the FEC's action: the corporate funds that the FEC has allowed the CPD to solicit in the end pay for free television exposure for the debate participants; and obviously Nader competes in the same arena with these other candidates.

[6] The CPD announced on January 6, 2000 that Anheuser-Busch would serve as one of the national financial sponsors for its 2000 presidential debates, as well as the sole financial sponsor of the October 17 debate in St. Louis, Missouri.

In addition, the FEC's analysis of <u>Vote Choice</u>, as the FEC itself suggested at oral argument, leads to the result that no candidate could ever challenge the FEC regulations in question here, regardless of how likely he or she was to be invited to debate. If the FEC is right that only those directly governed by the regulations can challenge them, then only debate staging organizations such as the CPD or their corporate donors could ever bring challenge. But these parties are beneficiaries of the regulations, and the regulations are permissive with respect to them. Hence, these parties are unlikely ever to have any incentive -- or, likewise, standing -- to seek to invalidate the regulations insofar as they permit corporate sponsorship of the debates.[7] In this respect, then, the regulations might effectively be immune from judicial review. We see no reason to read <u>Vote Choice</u> to imply this result.[8]

Annheuser-Busch reportedly paid $550,000 to underwrite the October 17 debate.

[7] Rather, such parties would likely bring challenge only if they were excluded for some reason from the benefits of being able to receive or donate corporate funds in support of the debates.

[8] We recognize that the mere implication "that if [the plaintiff has] no standing to sue, no one would have standing, is not a reason to find standing." <u>Valley Forge</u>, 454 U.S. at

-16-

Finally, we reject the FEC's suggestion in its brief that Nader's choice is self-imposed, that it "only exists because <u>he</u> perceives a dilemma, not because it appears anywhere in the regulations." Such a view would raise too high a bar for standing; clearly, one who challenges a governmental action may not be denied standing merely because his challenge in a sense stems from his own choosing. For example, if instead of involving corporate sponsorship, this case instead involved regulations allowing the CPD to impose speech restrictions on debate participants -- e.g., a requirement that the participants say a word of gratitude to the CPD's underwriters -- there would hardly be question that the debate participants would have standing to challenge such regulations, even though their objection might stem purely from a choice of conscience. <u>Cf., e.g.</u>, <u>Rust</u> v. <u>Sullivan</u>, 500 U.S. 173 (1991) (no standing question raised where doctors challenged regulations conditioning receipt of funds on compliance with speech

---

489 (citations omitted). But that is not what is wrong with the FEC's direct regulation theory. What is wrong with the FEC's theory is that it permits only those directly subject to the regulations to bring suit, when the very persons likely to be harmed by the regulations are not directly subject to them.

-17-

restrictions); <u>Virginia</u> v. <u>American Booksellers Ass'n</u>, 484 U.S. 383, 393 (1988) (self-censorship is harm sufficient for standing).[9]    In sum, the FEC regulations Nader challenges have caused him sufficient injury for the purposes of standing. By allowing corporate sponsorship of the debates, the regulations threatened to force Nader to decline an invitation to participate in the debates, and that threat affected the conduct of his campaign.  In light of the FECA's concern with ensuring that corporate funds do not undermine the fairness of federal elections, we find that Nader has claimed sufficient unfairness to his campaign to establish standing.  "To hold otherwise would tend to diminish the import of depriving a serious candidate for public office of the opportunity to compete equally for votes in an election," and would make it too difficult for candidates in Nader's position to challenge FEC regulations thought to impinge on that opportunity.  <u>See</u> <u>Fulani</u> v. <u>League of Women Voters Education Fund</u>, 882 F.2d 621, 626 (1989).

---

[9]    We note also that Nader's choice is not wholly ideological; he objects to participating in corporate-sponsored debates not only because they offend his principles, but because, on his view, they are illegal.

There remains, however, a question of redressibility. At the time he brought suit, Nader could have been provided with relief that would have redressed his injury -- namely, a judgment in effect preventing corporate sponsorship of the debates in time to preserve the possibility of his participation. Now that the 2000 presidential debates are over, such relief is no longer available. However, this subsequent redressibility problem is one of mootness, not standing. See Advanced Mgmt. Tech., Inc. v. FAA, 211 F.3d 633, 636 (D.C. Cir. 2000) (noting that "[s]tanding is assessed at the time the action commences," whereas mootness concerns whether "a judiciable controversy existed but no longer remains") (citing Friends of the Earth, 120 S.Ct. at 709) (internal quotation marks omitted). And the FEC conceded at oral argument that Nader's case is not moot. As other courts have held in similar cases, this sort of case qualifies for the exception to mootness for disputes "capable of repetition, yet evading review": corporate sponsorship of the debates is sure to be challenged again in future elections, yet, as here, the short length of the campaign season will make a timely resolution difficult. See Storer v. Brown, 415 U.S. 724, 737 n.8 (1974); Fulani v. League

-19-

of Women Voters Educ. Fund, 882 F.2d 621, 628 (2d Cir. 1989); Johnson v. F.C.C., 829 F.2d 157, 159 n.7 (D.C.Cir. 1987). Hence, Nader's case is not moot, and he has satisfied the requirements for standing.[10]

B. Whether Voters Have Standing

The voter plaintiffs assert two grounds for standing. First, they argue that, as voters, they are harmed directly by the corruption of the political process allegedly caused by corporate sponsorship of the debates. Second, the voters who have decided to vote for Nader argue that, as supporters of Nader, they suffer derivatively from any injury the FEC regulations cause him.

As to the first argument, the harm done to the general public by corruption of the political process is not a sufficiently concrete, personalized injury to establish standing. Plaintiffs cite to FEC v. Akins, 524 U.S. 11 (1998),

---

[10] Nader's interest in this case is identical to that of his party (represented by plaintiffs Green Party USA and the Association of State Green Parties) and campaign organization (the Nader 2000 Primary Committee); together, they represent the Nader candidacy that has been injured by the FEC regulations as described in the preceding discussion. Hence, by virtue of our finding that Nader has standing, we also find that these plaintiffs have standing.

for the proposition that any voting-related injury is per se sufficiently concrete and personalized to establish standing. But Akins does not open the door so wide. Akins held that individual voters had standing to challenge the FEC's decision not to subject the American Israel Public Affairs Committee to certain disclosure requirements. The Court's decision did not rest merely on the fact that the voters there had suffered a "voting-related" injury. Rather, what was important was that the voters had been denied access to information that would have helped them evaluate candidates for office, when such information was specifically required by statute to be disclosed to the public. See Akins, 524 U.S. at 21; see also Common Cause v. FEC, 108 F.3d 413, 418 (D.C. Cir. 1997) (limiting "informational standing" under FECA to cases in which plaintiffs are denied information that is "both useful in voting and required by Congress to be disclosed"). In contrast, the plaintiffs here allege no such particularized burden they will suffer as a result of corporate sponsorship of the debates. Their concern for corruption of the political process "is not only widely shared, but is also of an abstract and indefinite

-21-

nature," comparable to "the common concern for obedience to law." Akins, 524 U.S. at 23 (internal quotation marks omitted).

As to the argument of Nader's supporters that they suffer derivatively from his injury, again, such argument sweeps too broadly. Regardless of Nader's injury, his supporters remain fully able to advocate for his candidacy and to cast their votes in his favor. Compare Buckley v. Valeo, 424 U.S. 1, 94 (1976) ("[T]he denial of public financing to some Presidential candidates is not restrictive of voters' rights . . . ."), and Gottlieb v. FEC, 143 F.3d 618, 622 (D.C. Cir. 1998) ("The extra infusion of funds into the Clinton campaign did not impede the voters from supporting the candidate of their choice."), with Bullock v. Carter, 405 U.S. 134, 143-44 (1972) (holding that expensive filing fees keeping candidates from appearing on ballot harmed voters by preventing them from voting for the candidate of their choice). The only derivative harm Nader's supporters can possibly assert is that their preferred candidate now has less chance of being elected. Such "harm," however, is hardly a restriction on voters' rights and by itself is not a legally cognizable injury sufficient for standing. See Gottlieb, 143 F.3d at 622 (holding that voters cannot establish

-22-

standing solely on basis that their candidates have been unfairly treated).

## IV.

Having determined that Nader has standing, we turn to his challenge to the validity of the debate regulations. The issue before us is a narrow one:  whether the FEC debate regulations allowing corporate funding of certain debate staging organizations, 11 C.F.R. §§ 110.13 and 114.4(f), violate, on their face, the FECA.  The exclusion of Nader from the 2000 Presidential election debates is not at issue, nor is any constitutional claim asserted.  We review de novo the district court's decision to uphold the regulations, a question of law. Strickland v. Commissioner, Maine Dept. of Human Services, 96 F.3d 542, 545 (1st Cir. 1996).

The parties dispute whether this case requires deference to the administrative agency's determination under Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984).  Chevron governs the judicial review of agency regulations  to ensure that they comply with the applicable statutory scheme, and entails a two step analysis. If Congress has spoken to the precise question at issue and the

-23-

intent of Congress is clear, that is the end of the matter. Id. at 842. Agency regulations in accord with that unambiguously expressed intent are upheld; those that contravene that intent are invalid. But if the statute is silent or ambiguous with respect to the precise issue, then the question becomes whether the agency's regulations are based on a permissible construction of the statute. Id. at 843. In assessing the agency's construction of an ambiguous provision, courts, under this second step of Chevron, must defer to reasonable agency interpretation and implementation of the provision. United States v. Haggar Apparel Co., 526 U.S. 380, 383 (1999). The FEC is the type of agency which is entitled to such deference where congressional intent is ambiguous. FEC v. Democratic Senatorial Campaign Committee, 454 U.S. 27, 37 (1981).

Several key statutory provisions of the FECA are at issue. The FECA prohibits corporations from making any contribution or expenditure "in connection with" any federal election, 2 U.S.C. § 441b(a), and defines "contribution or expenditure" to include "any direct or indirect payment . . . or gift . . . to any candidate, campaign committee, or political party or organization," id. § 441b(b)(2). This general

-24-

prohibition is subject to three exceptions, which permit corporate funds to be used (1) for internal corporate communications; (2) for nonpartisan registration and get-out-the-vote campaigns by a corporation directed to its stockholders and executive and administrative personnel and their families; and (3) for the establishment of a separate segregated fund used for political purposes. Id. § 441b(b)(2)(A)-(C). In addition, the FECA's general definition section also addresses the term "expenditure," defining it to include any payments made "for the purpose of influencing any election for Federal office," id. § 431(9)(A)(i), but not to include "nonpartisan activity designed to encourage individuals to vote or to register to vote," id. § 431(9)(B)(ii).[11]

Implementing these statutory provisions, in 1980 the FEC promulgated debate regulations to govern contributions and expenditures made in sponsorship of candidate debates; in 1996, it revised them. Under the FEC's regulatory scheme, corporate contributions and expenditures may be made to defray the costs

---

[11]  No party has attributed any significance to the failure to exclude this latter category from the definition of "contribution."

of conducting candidate debates where those debates are held by nonpartisan organizations so long as those organizations and the structure of the debate meet certain criteria. Two interrelated regulations produce this result. First, Section 110.13 delineates the requirements for debate staging organizations, debate structure, and criteria for candidate selection necessary to qualify for exemption from the contribution and expenditure restrictions. Debate staging organizations must either be nonprofit organizations that "do not endorse, support, or oppose political candidates or political parties," or broadcasters that are "not owned or controlled by a political party, political committee or candidate." 11 C.F.R. § 110.13(a). The candidate debate must include at least two candidates and not be structured "to promote or advance one candidate over another." 11 C.F.R. § 110.13(b). Finally, debate staging organizations are required to use "pre-established objective criteria to determine which candidates may participate in the debate" and may not rely solely on nomination by particular parties. 11 C.F.R. § 110.13(c). Second, Section 114.4(f) allows nonprofit debate staging organizations to accept funds donated by corporations to defray costs incurred in staging candidate

-26-

debates and, on the flipside, expressly permits corporations to make such donations to qualifed debate staging organizations. 11 C.F.R. § 114.4(f). Complementing these sections, the FEC regulations defining the terms "contribution" and "expenditure" as covered by the Act expressly exempt the funds used in staging a qualified candidate debate from the "contributions" and "expenditures" regulated by the FECA. See 11 C.F.R. § 100.7(b)(21) (not included in "contributions"); id. § 100.8(b)(23) (not included in "expenditures"). In accordance with the requirements of the FECA, 2 U.S.C. § 438(d), the proposed regulations, along with the FEC's analysis, were sent to Congress and did not become final until Congress had opportunity to express disapproval.[12]

Nader argues that these debate regulations permit corporate contributions to flow to candidates in violation of the general prohibition of Section 441b(a) and that such contributions do not fall within the limited exceptions of Section 441b(b)(2)(A)-(C); further, he rejects the FEC's

---

[12] The Senate rejected an initial, more restrictive version of the debate regulations through this mechanism by unanimous resolution. See S. Res. 236, 96th Cong. (1979).

-27-

contention that the regulations permissibly construe ambiguities in what corporate disbursements qualify as "contributions and expenditures" under the Act. Nader argues the FEC's position must be rejected for several reasons. First, Nader contends that the general prohibition against corporate contributions and expenditures in Section 441b(a) stands alone and is not at all ambiguous. This prohibition, he says, reflects a clear congressional intent that corporate monies not go toward political activities unless they fall into one of the three narrowly drawn exceptions in Section 441b(b), none of which is applicable to candidate debates. Hence this provision reveals an unambiguous congressional intent that corporate monies not be used to sponsor candidate debates.

Second, Nader argues that when Congress enacted the more specific rules contained in Section 441b governing the use of general treasury corporate funds in 1976, it narrowed the exemption from the prohibition on corporate contributions so as to permit only those "nonpartisan registration and get-out-the-vote campaigns" that are aimed at the corporations' own "shareholders and executive or administrative personnel and their families." 2 U.S.C. § 441b(b)(2). While Nader

-28-

acknowledges that Section 431(9)(B)(ii) contains a more general exception permitting funding for "nonpartisan activity designed to encourage individuals to vote or to register to vote," that "permission" comes in the form of an exemption to the FECA's general definition of "expenditure." Nader maintains that the enactment of a specific provision dealing with corporate contributions and expenditures and defining those terms for that purpose renders the general definition inapposite, citing the principle that a specific statute governs over a more general one. See HCSC-Laundry v. United States, 450 U.S. 1, 6 (1981).

The specific exception in Section 441b(b)(2) for "nonpartisan registration and get-out-the-vote campaigns by a corporation aimed at its stockholders and executive and administrative personnel and their families," Nader argues, clearly does not exempt funding of candidate debates. Moreover, even if read in tandem with the general exemption excluding expenditures for "nonpartisan activity designed to encourage individuals to vote or to register to vote" in Section 431(9)(B)(ii), Nader maintains that the statute still contains no ambiguity regarding the legality of expenditures for

-29-

candidate debates because a debate cannot reasonably be described as such an activity.[13] Since sponsoring candidate debates does not fall into these exceptions to the prohibition of Section 441b(a), he contends that the clear intent of Congress as expressed in that prohibition must govern. Thus, Nader argues, there is no ambiguity in the statute that would permit the FEC, under the Chevron doctrine, to make policy interstitially. While disavowing any need to look at legislative history to clarify what Congress meant, Nader says that nothing in that history supports the FEC's reading. And so, Nader concludes, there is no gap in the statute on the

---

[13] Congress clearly did intend to permit corporate expenditures, Nader says, at least for internal nonpartisan voter registration and get-out-the-vote campaigns. But it is not enough, he argues, for the FEC simply to say that debates will "stimulate voter interest and that will lead more people to register to vote or to vote." 44 Fed. Reg. 76,736 (1979). Nationally televised debates serve predominantly as "a critical campaign showpiece for participating candidates." Nader concedes that had Congress said that an exemption applies to corporate expenditures for activities "such as" voter registration, then the FEC would be in a stronger position. See U.S. v. Haggar Apparel Co., 526 U.S. 380, 387 (1999). But the FECA contains no such language.

precise question of whether corporate funds can be used to finance electoral debates.[14]

In the alternative, Nader argues that even under the second stage of <u>Chevron</u> these regulations should fail. Nader maintains that the regulations cannot be a permissible construction of the statute because they are inconsistent with the purposes of the Act. Nader alleges that the FECA seeks to restrict the influence of corporate monies in political elections in order to protect the integrity of the electoral system. Since the debate regulations instead promote corporate involvement in political activity, they are not a reasonable interpretation of the FECA.

Finally, Nader responds to the common sense observation that these debate regulations have been in place for more than twenty years, that they have governed many well-publicized

---

[14] In a footnote in his appellate brief, Nader argues that even if Congress did leave the FEC discretion to create exceptions to the general prohibition on corporate funding, such a grant of discretion would violate the nondelegation doctrine as recently applied by the D.C. Circuit. <u>See</u> <u>American Trucking Ass'ns, Inc.</u> v. <u>EPA</u>, 175 F.3d 1027 (D.C. Cir. 1999), <u>cert. granted</u>, <u>Browner</u> v. <u>American Trucking Ass'ns, Inc.</u>, 120 S. Ct. 2003 (2000). Such summary treatment does not permit a reasoned analysis and we disregard the argument.

debates, and that Congress never once intimated that the FEC rules were contrary to its intention. Nader says that this "silence" proves nothing: a busy Congress cannot be expected to police every agency action; indeed, in 5 U.S.C. § 801(g) Congress forbade the courts to infer any such intent from its silence.[15]

The FEC responds that Nader's emphasis on the narrowness of the exceptions in Section 441b(b)(2)(B) and Section 431(9)(B)(ii) is misplaced: the debate regulations do not interpret the scope of these exceptions, the FEC contends; rather, they interpret what types of corporate disbursements count as "contributions and expenditures" in the first instance.[16] The FEC relies on asserted ambiguities in Section

_____

[15] 5 U.S.C. § 801(g) states: "If Congress does not enact a joint resolution of disapproval under section 802 respecting a rule, no court or agency may infer any intent of the Congress from any action or inaction of the Congress with regard to such rule, related statute, or joint resolution of disapproval."

[16] Nader suggests in his brief that the FEC has conceded in a prior proceeding that donations to debate staging organizations would constitute prohibited "contributions" absent the "safe harbor" created by the debate regulations. However, the FEC opinion he cites simply holds that donations to debate staging organizations that do not meet the requirements of Section 110.13 constitute prohibited contributions to the participating candidates, not that absent the regulations,

-32-

441b as well as Section 431(9) to justify its policymaking activity with regard to candidate debates. The general language of those sections, the FEC contends, says nothing indicating any congressional consideration, much less a clear congressional intent, about whether (or in what circumstances) sponsorship of candidate debates should be treated as a "contribution" or "expenditure," which the FEC claims is the "precise question at issue" in this case. Since the general provisions leave this question open, the FEC argues that the FECA effectively delegates that question to the policymaking authority of the agency. Moreover, the FEC suggests that its construction of the statute is reasonable in three additional respects: first, the narrow construction of the prohibitory language of the Act serves to protect First Amendment interests otherwise potentially implicated by it; second, the construction of the Act accords with Congressional intent as expressed in the

---

donations to any debate staging organization would necessarily constitute unlawful contributions. See FEC Statement of Reasons, In the Matter of Commission on Presidential Debates (April 6, 1998) at 4. In other words, the FEC regulations at issue can reasonably be viewed as defining the scope of the definitions of "contribution" and "expenditure" rather than creating exceptions to their clear terms.

legislative record; and third, the debate regulations serve purposes akin to those served by the existing exceptions to the statute's prohibitions.  Thus the FEC insists that the debate regulations reflect a reasonable construction of the FECA that is due Chevron deference.  Finally, the FEC also points to the fact that the debate regulations were submitted to Congress, which did not disapprove them, and have been in force quite publicly for twenty years.

Our analysis under Chevron begins with the question of whether the FECA statutory scheme reveals a clear congressional intent to ban the particular activity of corporate sponsorship of the debates as permitted under the regulations.  We conclude that several aspects of the statutory scheme, rather than indicating a clear congressional intent on the issue, in fact foster ambiguity.  As a primary matter, it is not clear on the face of the definitions of "contribution" and "expenditure" that corporate disbursements to nonpartisan debate staging organizations even fall within the scope of the Act's coverage in the first instance.  Section 441b bars corporate contributions or expenditures "in connection with any election," 2 U.S.C. 441b(a), including direct or indirect corporate

payments or gifts "to any candidate, campaign committee, or political party or organization."  Id. § 441b(b)(2).  Section 431(9) defines "expenditures" as any payments made "for the purpose of influencing any election for Federal office."  Id. § 431(9)(a)(i).  In neither case is it clear that corporate disbursements to nonprofit debate staging organizations fall within the ambit of the respective definitions, as such payments are not clearly "in connection with any election," nor are they clearly "indirect payments . . . to any candidate," nor are they clearly made "for the purpose of influencing any election for Federal office."  These imprecise definitional phrases display the ambiguity present in the statutory scheme.  The Supreme Court itself has observed (in a different context) that the phrase, "for the purpose of influencing any election," is ambiguous.  See Buckley v. Valeo, 424 U.S. 1, 79-80 (1976).  In light of this uncertainty, the statute taken as a whole does not express a clear congressional intent with respect to the precise question at issue.

Other language in the FECA reinforces our finding that the statute is ambiguous.  First, that Congress intended to delegate broad policymaking discretion to the FEC is confirmed

-35-

by the statutory charge that the FEC shall "formulate policy under the Act." 2 U.S.C. § 437. Congress also lodged a degree of flexibility in the definitions of "contribution" and "expenditure" in particular where it defined them to "include" certain uses and phrased the exceptions to their general prohibitions as enumerating activities that the terms "shall not include." See id. § 441b. The Supreme Court has recognized an element of flexibility in the term "include," as it indicates that "activities not specifically enumerated in that section may nonetheless be encompassed by it." FEC v. Massachusetts Citizens For Life, Inc., 479 U.S. 238, 246 (1986). Thus the definitions are not only of uncertain scope but also employ language suggestive of flexibility.

The language and structure of the exceptions to the prohibitions also suggest ambiguity. The statutory phrase "nonpartisan activity designed to encourage individuals to vote or register to vote" at Section 431(9)(B)(ii) gives the Commission some leeway to interpret the term "activity" and to decide which activities so "encourage" people. In addition, the statutory structure gives rise to a second question: how the specific corporate funding prohibition and exception in Section

-36-

441b(b)(2)(B) are meant to operate with the more general "encouraging activity" provision of Section 431(9)(B)(ii). It is unclear whether the specific provision trumps the earlier "encouraging activity" exception by limiting it and removing any leeway in the Commission, as Nader contends, or whether Congress intended the two sections to work together and to provide some flexibility to the Commission. In light of these questions, we find the statute is not clear on its face and rules of statutory interpretation do not compel any one particular answer to the precise question at issue.

Resort to the legislative history, even if appropriate, fails to dispel this uncertainty and provide a clear Congressional intent. We explain, beginning with the amendments Congress has made to the Act in response to judicial developments. Although the language of the statute is seemingly broad, that language has often been reviewed by courts in light of constitutional constraints, that is, the First Amendment rights of those regulated. See United States v. C.I.O., 335 U.S. 106, 123-24 (1948) (union political endorsements directed to union members are not contributions or expenditure covered by the predecessor of the Act); MCFL, 479 U.S. at 249 (corporate

-37-

communications about candidates that do not expressly advocate the election or defeat of a clearly identified candidate); <u>Maine Right to Life Committee, Inc.</u> v. <u>FEC</u>, 98 F.3d 1 (1st Cir. 1996) (same), <u>cert. denied</u>, 552 U.S. 810 (1997); <u>Clifton</u> v. <u>FEC</u>, 114 F.3d 1309 (1st Cir. 1997) (corporate voter guides comparing the positions of competing candidates), <u>cert. denied</u>, 522 U.S. 1108 (1998); <u>Orloski</u> v. <u>FEC</u>, 795 F.2d 156 (D.C. Cir. 1986) (corporate donations to picnic during which incumbent candidate addressed constitutents).

These decisions, in turn, led Congress to amend the original statute. As the FEC notes, the statute has changed over time so as to mesh more smoothly with subsequent court decisions and other related statutes. The exceptions to the prohibition now set out in Section 441b(b) were added to the predecessor of Section 441b in 1971 largely to codify earlier court decisions. <u>See, e.g.</u>, <u>Pipefitters Local Union No. 562</u> v. <u>United States</u>, 407 U.S. 385, 409-13, 421-27 (1972) (exception allowing segregated political fund codified prior case law). Congress then refined the exceptions in 1974, excepting "nonpartisan activity designed to encourage individuals to vote or to register to vote." <u>See</u> 2 U.S.C. § 431(9)(B)(ii).

-38-

Finally, in 1976, Congress incorporated the prohibitions on corporate expenditures and the concomitant exceptions previously codified at 18 U.S.C. § 610 into the FECA with the enactment of Section 441b, which specifically excepted from the prohibition on corporate expenditures the internal registration and get-out-the-vote activities described earlier. See 2 U.S.C. § 441b(b)(2)(B).

The FEC says that Congress illuminated how these provisions were meant to work together in the legislative history:

> The conferees' intent with regard to the inter-relationship between sections [2 U.S.C. 431(9)(B)(ii)] and [2 U.S.C. 441b(b)(2)(B)] which permit such activities as assisting eligible voters to register and get to the polls, so long as these services are made available without regard to the voter's political preference, is the following: these provisions should be read together to permit corporations both to take part in nonpartisan registration and get out the vote activities that are not restricted to stockholders and executive or administrative personnel, if such activities are jointly sponsored by the corporation and an organization that does not endorse candidates and are conducted by that organization; and to permit corporations, on their own, to engage in such activities restricted to executive or administrative personnel and stockholders and their families. The same rule, of course, applies to labor organizations.

-39-

H.R. Conf. Rep. No. 94-1057, at 63-64 (1976). Indeed, a key phrase in this legislative history indicates that Congress intended to permit corporate funding of "such activities as" assisting eligible voters. Once again, rather than collapsing ambiguity, this legislative history confirms it.

Finally, although our conclusion that the debate regulations coincide with congressional intent would be the same in any event, we note that this view is consistent with Congress's apparent acquiescence in the regulations under the "report and wait" requirements of the FECA. Nader's reliance on the admonition against inferring any intent from Congress's silence in 5 U.S.C. § 801(g) is inappropriate, as that provision is limited to proposed rules submitted to Congress under the disapproval mechanism established in 5 U.S.C. §§ 801 and 802, and hence does not apply to regulations promulgated by the FEC under 2 U.S.C. § 438(d) long before the enactment of 5 U.S.C. § 801 in 1996. Moreover, this is not a situation of complete congressional inaction; the failure to disapprove of the current debate regulations takes on additional significance in

light of Congress's rejection of the FEC's initial proposal.[17] Thus we conclude that the FECA expresses no clear congressional intent on the precise issue in this case -- the corporate sponsorship of qualified debate staging organizations to defray the costs of conducting candidate debates.

Since we have determined that the FECA does not answer the precise question at issue, the question thus becomes whether the FEC's efforts in the debate regulations to permit such corporate sponsorship, and to define the proper scope of "contribution" and "expenditure" as used by the Act, reflect a permissible construction of the statute. Under Chevron, absent an unambiguously expressed congressional intent on the precise issue, the courts must defer to the Commission's construction if it is reasonable and not inconsistent with the statute. Duckworth v. Pratt & Whitney, Inc., 152 F.3d 1, 5 (1st Cir. 1998). The debate regulations at issue pass that test.

_____

[17] Indeed, when the Senate rejected the initial proposal, the floor statements of the resolution's cosponsors indicated that the Senate was concerned that the initial proposed regulations were too intrusive and burdensome on debate sponsors, not too permissive in allowing corporate sponsorship of debates. See 125 Cong. Rec. 24,957-58 (1979) (statements of Sen. Pell and Sen. Hatfield).

First, the debate regulations reflect a reasonable understanding of the purposes of the FECA, and in fact parallel the purposes of its express exceptions. In 1979, the Commission addressed the funding and sponsorship of candidate debates in a rulemaking. The Commission decided that since the legislative policy behind the express exceptions was to permit corporations and unions to fund activity directed to the general public to encourage voter participation so long as the activity is conducted primarily by a nonpartisan organization, "permitting corporations and labor organizations to donate funds to nonprofit nonpartisan organizations for [debate] staging is consistent with congressional intent and policy." FEC, Explanation and Justification, Funding and Sponsorship of Federal Candidate Debates, 44 Fed. Reg. 74,734, at 76,736 (1979); see also 44 Fed. Reg. 39,348, at 39,349. The Commission concluded that "[t]he educational purposes" of a debate staged by such nonpartisan organizations "is similar to the purpose underlying nonpartisan voter registration and get-out-the-vote campaigns." Id. at 39,348. "Unlike single candidate appearances, nonpartisan debates are designed to educate and inform voters rather than to influence the nomination or

-42-

election of a particular candidate. Hence, funds received and expended [by certain nonprofit organizations] to defray costs incurred in staging nonpartisan public debates are not considered contributions or expenditures under the Act." Id. Moreover, the FEC's debate regulations are in accord with congressional expectations as expressed in the legislative history discussed above. It is certainly within the purview of agency discretion to accord respect to congressional intent as reflected in the legislative record.

Finally, the debate regulations are not inconsistent with the definitions of "contribution" and "expenditure" provided by Section 441b. As the prohibition contained in Section 441b did not specifically address corporate donations to nonpartisan tax exempt organizations but rather addressed payments "to any candidate, campaign committee, or political party or organization," the Commission reasonably determined that the prohibition need not apply to corporate disbursements to nonpartisan tax exempt organizations for the limited purpose of staging candidate debates. The Commission's determinations that the prohibition was especially concerned with "active electioneering" to promote a particular candidate and that

sponsoring a nonpartisan debate was not "active electioneering" were similarly permissible. And the fact that the regulations allow corporate contributions to candidate debates in order to encourage voter participation in a fashion not expressly permitted by the statute does not itself invalidate the regulation. "Agencies often are allowed through rulemaking to regulate beyond the express substantial directives of the statute, so long as the statute is not contradicted." Clifton, 114 F.3d at 1312. Hence, the Commission's views are not unreasonable, nor are they inconsistent with the statute.

We note that Nader's interpretation of the FECA is also not unreasonable. He argues that the debates in fact promote the campaigns of those invited to participate. As amicus CPD says, the goal of its debates "is to afford the members of the public an opportunity to sharpen their views, in a focused debate format, of those candidates from among whom the next President and Vice President will be selected."[18] Insofar as such debates have the primary effect of showcasing the candidacies of those selected to participate, Nader reasonably

---

[18] We acknowledge with appreciation the amicus brief submitted by the CPD.

concludes that corporate funding of the debates might be viewed as contributing in effect to the candidacies of the participants. But Congress gave the choice as to the preferred reasonable interpretation to the FEC, not to Nader. The task for the reviewing court under <u>Chevron</u> is only to undertake the narrow inquiry into whether the agency's construction is sufficiently reasonable to be accepted by the reviewing court.

The debate regulations at issue do not contravene the unambiguously expressed intent of Congress, as reflected in the FECA statutory scheme, but rather fall within the scope of the policymaking authority Congress delegated to the FEC under the Act. Moreover, the regulations reflect a permissible construction of the statute, indeed one that easily falls within the reasonable ambit of the statutory terms.

We reject Nader's challenge and affirm the district court judgment dismissing his suit. So ordered. No costs are awarded.

Concurrence follows.

**TORRUELLA, <u>Chief Judge</u>, concurring.**  Although I agree with the majority's affirmance of the district court's dismissal of this action, I would not have reached the merits of this case, because I believe Ralph Nader lacks standing for the reasons stated herein.  Even if Nader has standing, I would find that there is no Article III case or controversy here, as Nader's claim is moot at this point in the litigation.

**I.**

Standing doctrine embraces both constitutional mandates and prudential considerations.[1]  <u>See</u> <u>Allen</u> v. <u>Wright</u>, 468 U.S.

---

[1]     Because I find that Nader lacks the constitutional requirements for standing, I have not addressed the issue of prudential standing.  However, a plaintiff generally has prudential standing under § 10(a) of the APA when his interest is "arguably" within the "zone of interests to be protected or regulated by the statue in question."  <u>National Credit Union Admin.</u> v. <u>First Nat'l Bank & Trust Co.</u>, 522 U.S. 479, 489 (1998) (quoting <u>Assoc. of Data Processing Serv. Orgs.</u>, 397 U.S. 150, 153).  Given that this section of the FECA is designed to prevent corruption in campaign finance, <u>see, e.g.</u>, <u>FEC v. National Right to Work Comm.</u>, 459 U.S. 197, 209 (1982), and that Nader challenges it not based on corruption per se, but because it provides additional advantages to his competitors, his injury at first blush lies outside the statutory zone of protection.  The fact that Nader personally is concerned with corruption in politics is particularly irrelevant to the standing question.  <u>See</u> <u>Lujan</u> v. <u>Defenders of Wildlife</u>, 504 U.S. 555, 573-74 (1992) ("[A] citizen's interest in proper application of the Constitution and laws . . . does not state an Article III case or controversy."); <u>United States</u> v. <u>AVX Corp.</u>, 962 F.2d 108, 114

737, 751 (1983). When a plaintiff lacks standing in a constitutional sense, this Court lacks jurisdiction under Article III. See Warth v. Seldin, 422 U.S. 490, 498-99 (1975). The constitutional component of standing derived from Article III requires that "a plaintiff . . . allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." Allen, 468 U.S. at 751. In other words, the plaintiff must show (1) "actual or threatened injury as a result of the defendant's putatively illegal conduct," (2) "that the injury may fairly be traced to the challenged action," and (3) "that a favorable decision will redress the injury." Vote Choice Inc. v. DiStefano, 4 F.3d 26, 36 (1st Cir. 1993). Although these concepts are admittedly "not susceptible of precise definition,"

_____

(1st Cir. 1993) ("A mere interest in an event--no matter how passionate or sincere the interest and no matter how charged with public import the event--will not substitute for an actual injury.").

Furthermore, to the extent the district court viewed the prudential analysis as considerations "weighing" in Nader's favor, the court made an error of law. If the plaintiff fails to meet the constitutional standing guidelines, no assessment of his personal concern can create an Article III case or controversy. See Lujan v. Defenders of Wildlife, 504 U.S. at 560-61 (three elements are the "irreducible constitutional minimum").

Allen, 468 U.S. at 751, our case law has provided a sufficient outline of the standing map to address this petitioner.

The extent and type of injury required for constitutional standing is not easily defined.  It must at the very least be "distinct and palpable," id. (quoting Gladstone, Realtors v. Village of Bellwood, 441 U.S. 91, 100 (1979)), and not "abstract," "conjectural," or "hypothetical," id. (quoting Los Angeles v. Lyons, 461 U.S. 95, 101-102 (1983); O'Shea v. Littleton, 414 U.S. 488, 494 (1974)).  As I read his claim, Nader asserts two distinct theories of injury.  First, he claims an injury derived from the  "coercive choice" potentially posed by the allegedly illegal debate regulations.  According to Nader, if he is invited to participate in the debates, he will be forced into a Hobbesian choice: either compromise of his corporate watchdog platform or loss of an important avenue for communication.  Second, Nader claims injury as a political competitor: opponents invited to the debate benefit directly from allegedly illegal corporate sponsorship.

The problem with the majority approach, as I see it, is that the majority found standing here by collapsing these two very separate theories.  If he had been invited to the debate,

-48-

Nader may indeed have faced a choice between accepting corporate sponsorship and losing free national exposure. However, as he was not invited to the debate, he did not face this choice; he cannot be injured by any coercive effect it might have had, or by any strategic changes to his campaign such a choice might entail. Likewise, it is surely true that Nader was at a competitive disadvantage because his opponents participated in the debates. He may have had to alter his strategy to cope with the free air time that they receive. However, to the extent that Nader faces this problem, it is because he is a political competitor, not because he faces a coerced choice under the Vote Choice analysis; his unwillingness to participate in the debates if invited did not affect Nader's response to this free air time. And as I discuss below, his injury as a political competitor is not traceable to the challenged regulations because he cannot show that the debates likely would not occur without the corporate sponsorship.[2]

---

[2] Throughout, the majority examines Nader's situation in June, when this lawsuit was filed, under the assumption that standing is measured only at the time of filing. Although some cases hold that standing is only measured at that time, other cases point in the opposite direction, i.e., that a petitioner must retain standing throughout the litigation. See, e.g.,

## A.

I began by addressing the "coerced choice" theory. Relying on Vote Choice, Nader claims that the allegedly impermissible regulation coercively impacted the strategy and conduct of his presidential campaign. In Vote Choice, Elizabeth Leonard, a Rhode Island gubernatorial candidate, challenged a set of state campaign finance laws that: (i) required candidates

Powder River Basin Resource Council v. Babbitt, 54 F.3d 1477, 1485 (10th Cir. 1995). Such a conclusion would seriously complicate the majority's approach; far before oral argument it was quite clear that Nader would not receive an invitation to the debate, and thus his campaign strategy was determined without any influence of a potential choice.

Although the majority suggests that Powder River no longer provides any authority because of the Supreme Court's intervening decision in Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 120 S. Ct. 693 (2000), I note that although the Court described standing as "[t]he requisite personal interest that must exist at the commencement of the litigation," id. at 709, it also did "not license courts to retain jurisdiction over cases in which one or both parties plainly lacks a continuing interest," id. at 710. Friends of the Earth thus distinguished standing from mootness, but primarily to indicate that because the mootness analysis occurs at the end of litigation, there are important differences between the two doctrines. See id. My point here, which is supported by Powder River and not directly contradicted by Friends of the Earth, is that when standing disappears in the early stages of litigation, we should perhaps dismiss for lack of standing even if it may have existed at the time of the complaint.

upon declaring their candidacy to make an irrevocable election whether to use public funds; (ii) forced candidates electing to use public funds to sign an irrevocable pledge to abide by various terms and conditions of the fund grant; and (iii) created significant differences in legally allowed contributions between those who accepted and those who did not accept public funding (a so-called "contribution cap gap").  Although Leonard had not accepted the public funding and never actually faced a publicly funded opponent, we found that she retained standing to challenge the public funding provisions.  We reasoned that "when declaring her candidacy, Leonard had to make an irrevocable commitment" as to her use of public funding.  Vote Choice, 4 F.3d at 36-37.  As a result, she had to plan her campaign strategy based on the possibility that her opponent (perhaps an undeclared one) would make the opposite choice; "the coerced choice between public and private financing colored her campaign strategy from the outset."  Id.  We concluded that "such an impact on the strategy and conduct of an office-seeker's political campaign constitutes an injury of a kind sufficient to confer standing.  See id.

Nader argues, and the majority agrees, that the allegedly illegal corporate contributions to the debate organizing entity create a coercive choice of the type in Vote Choice, and thus standing follows. However, there is an important distinction between the two situations. Vote Choice did not grant Leonard standing simply because of the benefits given to her publicly funded opponents under Rhode Island campaign finance law. To do so would have premised standing on Leonard's injury as a political competitor; that is, it would have found injury due to the additional benefits accrued by her opponents. Such a theory may be viable here, and I discuss it below. Vote Choice, however, premised standing on the fact that Leonard's choice not to accept such benefits shaped her strategy throughout the race. In other words, because Rhode Island provided allegedly unlawful incentives to accept public funding, a candidate could challenge those incentives even if they did not ultimately rely on them. But in the present case, Nader was not coerced into making this choice — in fact, he has been saved from coercion by the lack of sufficient public support to meet the threshold set by the Commission on Public Debates (the "CPD"). Unlike Leonard, whose campaign strategy was altered by

an irrevocable choice made at the start of her campaign, Nader never faced such a dilemma. If he had, I would have found standing under Vote Choice.

However, the majority finds potential coercion even when none actually exists. In my view, by creating a present harm from the possibility of a future one, they dangerously expand our standing jurisprudence. The majority begins with the theory that because Nader has chosen not to accept corporate contributions, he was barred from the debates at the time the CPD accepted corporate donations, whether he proved ultimately eligible or not. If the debates were not funded by corporations, however, Nader would have been able and willing to participate if he had been invited. This seems plausible to me. However, the majority continues, this "threat" of being forced to decline a debate invitation in the future "had a palpable and immediate impact on [Nader's] campaign strategy and expenditures," namely that Nader spent "more on advertising than he would [have] if there remained a chance that he could appear in the debate." I agree with the majority that it is not generally proper for this institution "to second-guess a candidate's reasonable assessment of his own campaign."

-53-

However, I am not willing to grant a petitioner seeking standing free reign to allege changes in strategy forced only by the possibility of future events. Much as our standing jurisprudence requires the injury to be "distinct and palpable," Allen, 468 U.S. at 751, I believe that a strategic harm argued under Vote Choice must be more than a mere potentiality. And unlike the majority, I find something "improbable" about the proposition that a threatened choice three months in the future impacted Nader's strategy at the time of the complaint.

Let me expand. In June of 2000, at the time he filed this complaint, Nader admittedly failed to meet the eligibility requirements set by the CPD in January of 2000.[3] Specifically, he had not reached the 15% popular opinion threshold, although some polls had him in the 6 % range. See Frank Newport, Gallup News Service, Poll Releases (October 23, 2000), available at http://www.gallup.com/poll/releases/pr001023.asp. In June, Nader's potential strategies were thus either to attempt to

---

    [3]    These eligibility requirements were: (i) constitutional eligibility; (ii) appearance on a sufficient number of state ballots to achieve an Electoral College majority; and (iii) a level of support exceeding 15% according to major national polls. See Joint Appendix 174-76.

-54-

reach the 15% threshold, so that he would be eligible for the free exposure of the debates, or not to attempt to reach the 15% threshold.  However, given that he was running for President of the United States, the latter choice does not seem a viable one – whether or not he received a debate invitation.  Moreover, Nader has never asserted that, because he would not accept a debate invitation under any circumstances, he resigned himself to a failed campaign that would never reach the 15% mark.

Even ignoring the infirmities of this theory of strategic impact, I note that Nader has not alleged that his campaign strategy was so affected by the potential choice which he faced.  His main brief merely asserts that "Nader and his organizational supporters have been forced to adjust their campaign strategy to compensate for the benefits conferred upon Nader's competitors by the Debate Regulations" (emphasis added). In Nader's reply brief, he explains the strategic impact of the regulations in slightly more detail: "Nader has been forced to spend more of his campaign's money on advertising in order to overcome the free television time that candidates Bush and Gore have and will continue to receive as debate participants."  In this regard, Nader is correct: the fact that his opponents will

participate in the debates and that he will not (either because he is not invited or because he chooses not to) means he will have to spend additional advertising funds to match their free television time. However, Nader's phrasing indicates that the strategic impact of the debate regulations, in his mind, is only related to the receipt of illegal (according to him) money by his opponents. Nader says nothing about planning for the possibility of receiving free debate time; he has apparently assumed that he will not compete and formed his campaign strategy based on that assumption. This is very different from the strategic impact proposed by the majority, and it is also foreign to our analysis in <u>Vote Choice</u>. At base, Nader is claiming injury as a political competitor; the majority's attempt to dress it as a future choice with a present strategic impact is misguided and not supported by either appellant's brief or their approach at oral argument. Furthermore, unlike in <u>Vote Choice</u>, the district court here failed to make clear findings of strategy, simply noting that appellants had alleged a strategic harm. <u>See</u> <u>Becker</u> v. <u>FEC</u>, No. 00-11192-PBS, at 14 (D. Mass., September 1, 2000). Even if it is inappropriate for a court to evaluate the actual impact of a choice on a

candidate's strategy, and even if a court should accept the candidate's assessment of the impact at face value with hardly any inquiry, we need not premise injury on a supposed strategic impact not even argued by the petitioner.

In short, I find that theoretical injury caused by potential future choices is the type of injury the Supreme Court warned against in Lujan.  In Berner v. Delahanty, 129 F.3d 20 (1st Cir. 1997), we noted specific hurdles for abstract harms such as this:

> The [Supreme] Court placed a special gloss on cases in which a party seeks exclusively injunctive or declaratory relief.  In such purlieus, standing inheres only if the complainant can show that he has suffered (or has been threatened with) "an invasion of a legally protected interest which is . . . concrete and particularized," Lujan, 504 U.S. at 560, together with "a sufficient likelihood that he will again be wronged in a significant way," Lyons, 461 U.S. at 111. In other words, the complainant must establish that the feared harm is "actual or imminent, not conjectural or hypothetical." Lujan, 504 U.S. at 560.  It bears noting that the imminence concept, while admittedly far reaching, is bounded by its Article III purpose: "to ensure that the alleged injury is not too speculative."  Id. at 564 n.2.

I do not find that Nader has made a sufficient showing of a "concrete and particularized" injury; the unfocused "threat" of

-57-

a coerced choice sometime hence is much like the overly speculative "'some day' intentions" that the Supreme Court found lacking in Lujan.   Id. at 564.

The problem of abstractness and lack of imminence is further revealed by the opening the majority creates for future litigants.   Because the majority analysis places its present harm in the possibility of a future choice, anyone that could face the future choice must have the same injury.   No language in the majority necessarily restricts this to candidates with a significant chance of facing the future choice; presumably, the possibility of this choice affected Nader's strategy prior to June.   It theoretically could have altered his decision even to enter the race.   In expanding standing to Nader here, the majority grants standing to any political entrant to challenge any election regulation to which they might someday be subject.[4]

---

[4]      Although the majority contends that its holding is "nowhere near so broad" as I have suggested, I am unconvinced. Their basic point is that potential choices in the future can alter strategy today, and that forced changes in strategy today can meet the injury requirement for standing.  I see no clear way of distinguishing Nader's "plausible" hope that he would be invited to the debates "at a definite date" in the future, from perhaps slightly less plausible (but still possible) hopes that may occur at a more distant time.

**B.**

Nader's second theory of standing is not based on the strategic underpinnings of his own campaign, but on the theory that the corporate contributions to the CPD impermissibly help his competitors, essentially providing Gore and Bush with inexpensive access to extensive media coverage. The theory that a political competitor incurs injury because of an impermissible benefit to his opponent is premised on a line of cases granting standing to economic competitors. See, e.g., Clarke v. Securities Indus. Ass'n, 479 U.S. 308, 403 (1987).

Courts have, however, been reluctant to adopt this "political competitor" theory of standing, not so much because the injury faced by a plaintiff is not a real one, but because that injury generally cannot be traced to the challenged regulation, nor is the injury usually redressable by

---

For example, Nader is running for President. Presumably, issues affecting the President of the United States inform his decision to run, which is undoubtedly part and parcel of his campaign strategy. Yet I doubt very much that the majority would grant Nader standing to challenge, say, the calculation of the presidential salary, simply because he may potentially be subject to its dictates. However, I believe that the majority's theory of standing would require them to do so if Nader asserted that such issues altered his current campaign strategy.

invalidating the regulation.  Three cases pursued by minor party

candidate Lenora Fulani indicate the contours of this standing

doctrine.  In Fulani v. League of Women Voters Educ. Fund, 882

F.2d 621 (2d Cir. 1989), the Second Circuit found that Fulani

had standing to challenge the tax-exempt status of the League of

Women Voters.  Fulani claimed that the League's refusal to

include her in debates deprived her of critical media exposure

and competitive advantage, as well as the opportunity to

communicate her political ideas to the electorate.  The court

found that:

> [T]he loss of competitive advantage flowing
> from the League's exclusion of Fulani from
> the national debates constitutes sufficient
> "injury" for standing purposes, because such
> loss palpably impaired Fulani's ability to
> compete on an equal footing with other
> significant presidential candidates.  To
> hold otherwise would tend to diminish the
> import of depriving a serious candidate for
> public office of the opportunity to compete
> equally for votes in an election, and would
> imply that such a candidate could never
> challenge the conduct of the offending
> agency or party.

Fulani v. League, 882 F.2d at 626.  The Second Circuit then

found that the other prerequisites for standing were met,

because removing the League's not-for-profit status would end

the League's ability to sponsor debates, and probably would have meant the absence of any debates in the 1988 campaign season.

In _Fulani_ v. _Brady_, 935 F.2d 1324 (D.C. Cir. 1991) and _Fulani_ v. _Bentsen_, 35 F.3d 49 (2d Cir. 1994), both the Second and the D.C. Circuits cut back on this approach, in cases more nearly mirroring our own. In _Fulani v. Brady_, Fulani sought standing to challenge the tax-exempt status of the CPD based on its decision that she lacked a realistic chance of being elected President, and its concordant refusal to invite her to the 1988 presidential debates. The D.C. Circuit focused its inquiry on the fact that Fulani was challenging a tax exemption, and noted strong judicial precedent against the ability to challenge the tax treatment of a competitor. See _id._ at 1327. In particular, Fulani could not meet the standing requirements of traceability and redressability: first, many factors beyond the tax-exempt status of the CPD were influential in excluding Fulani from the debates; second, revocation of the tax-exempt status of the CPD would not necessarily have any impact on the purportedly unfair provision of media coverage to the major party candidates. See _id._ at 1328-29. Although Nader is not challenging a tax exemption, his claim is once removed because it does not

-61-

challenge the entity hosting the debate (the CPD) but that entity's source of funds. At best, a Nader victory here could require the CPD to find other sources of funds; it would not necessarily reduce his opponent's television exposure, nor would it likely cancel the debates.

In _Fulani_ v. _Bentsen_, Fulani again challenged the tax status of the League. However, the Second Circuit, noting that the debate in question was co-sponsored by CNN, refused to find injury based on "the alleged incremental advantage accorded participants in debates in which the League plays a sponsoring role." _Id._ at 52-53. In other words, the fact that Fulani's competitors might benefit from the accouterments of League sponsorship was insufficient to create standing. Similarly, the fact that Nader's competitors may gain incremental advantages through their association with corporate sponsors is an insufficient basis for standing, given that a decision by this Court will have little or no impact on the exposure they gain due to the debate.

Moreover, the Second Circuit has indicated that for a plaintiff to gain standing as a political competitor, he must "personally compete in the same arena with the same party to

whom the government has bestowed the assertedly illegal benefit." In re United States Catholic Conference, 885 F.2d 1020, 1029 (2d Cir. 1989). In this case, the benefit has perhaps been conferred upon the sponsoring corporations, who at the most are allowed to further their political viewpoint by sponsoring a two-person debate, and at least are given additional air-time for their beer and pretzels. Perhaps the benefit has been conferred upon CPD, the entity which receives the allegedly illegal contributions. Nader would argue that Gore and Bush receive the unlawful benefit, and that as their competitor he has standing. However, Fulani v. Bentsen explicitly refused to extend the competitive standing rule to encompass this removed level of competition. Id. at 54 ("We decline to extend the rule of Catholic Conference to encompass not only a plaintiff's competitors in a defined arena, but also any entity that provides a tangential benefit to those competitors."). Nader does compete with Bush and Gore, who may or may not have received tangential benefits from corporate sponsorship of the debates; however, I fear that expanding competitor standing to this extent gives plaintiffs the ability to challenge a host of regulations that, while undoubtedly

having incidental beneficial effects on their competitors, are not traceable to a concrete, particularized harm. <u>See</u> <u>Catholic Conference</u>, 885 F.2d at 1028; <u>see also</u> <u>Gottlieb v. FEC</u>, 143 F.3d 618, 621 (D.C. Cir. 1998) (AmeriPAC could not challenge matching funds received by the Clinton campaign, because it was never in a position to receive such matching funds itself).

## C.

The majority rues the fact that this analysis "leads to the result that no candidate could ever challenge the FEC regulations in question here, regardless of how likely he or she was to be invited to the debate." First, I dispute this premise. Although no candidate may be able to challenge the regulations under a political competitor theory of standing, it is certainly possible that a candidate would have standing under the <u>Vote Choice</u> theory, if he or she actually faced a coerced choice. If Nader had reached the 15% mark, been invited to debate, and then refused to do so, I would be tempted to find standing here. Al Gore or George W. Bush could potentially have challenged the regulations as well. Furthermore, under the competitor theory, a rival debate organization or a potential non-corporate sponsor that could not afford the CPD's

-64-

sponsorship prices might have successfully defended their standing as an economic competitor. In any event, even in the majority's refusal to read Vote Choice as implying that "the regulations might effectively be immune from judicial review," the majority admits that the fact that the plaintiff might be the best person to have standing does not in itself give them standing. See Valley Forge Christian Coll. v. Americans United for the Separation of Church and State, Inc., 454 U.S. 464, 489 (1982).

I do not doubt "the powerful beneficial effect that mass media exposure can have today on the candidacy of a significant aspirant seeking national political office." Fulani v. League, 882 F.2d at 626. But this effect alone is insufficient to confer standing on such an aspirant simply because his claim is related to this mass media exposure.

## II.

The majority gives short shrift to the question of mootness, stating conclusively that "this sort of case qualifies for the exception to mootness for disputes 'capable of repetition, yet evading review.'" I have no quarrel with the claim that this case is capable of repetition: under the

majority's theory of standing, in fact, it is all _too_ capable of repetition as any candidate or potential candidate could claim that their strategy is affected by the potential that they will be subject to a choice down the campaign trail.

The Supreme Court has indicated that election cases are particularly privy to this mootness exception. _See_ _Storer_ v. _Brown_, 415 U.S. 724, 737 n.8; _Rosario_ v. _Rockefeller_, 410 U.S. 752, 756 n.5 (1973); _Dunn_ v. _Blumstein_, 405 U.S. 330, 333 n.2 (1972); _Moore_ v. _Ogilvie_, 394 U.S. 814, 816 (1969). However, all of these cases involved burdens placed on candidates or voters in order for them to participate in the election process, an inherently time-sensitive issue.[5] For example, in _Storer_, petitioners challenged ballot access and nomination procedures necessarily occurring between the primary and the general election. _See_ _id._ at 726-28; _see also_ _Rockefeller_, 410 U.S. at 752-56 (similar issue). _Dunn_ involved a challenge to state

---

[5] In addition, these election exceptions to mootness involved First Amendment constitutional challenges, an area afforded special treatment by the Court's standing and mootness jurisprudence. _See, e.g._, _Rust_ v. _Sullivan_, 500 U.S. 173 (1991) In contrast, Nader does not raise a First Amendment challenge of any sort, but simply challenges the legality of FEC regulations. The majority recognizes this distinction, but chooses to rely upon it to find an exception here.

residency requirements which a would-be voter might not be able to challenge until just before the election, and which would without the exception become moot immediately after the election. See id. at 333-34. In Fulani v. League, Fulani's standing arose only at the time she was not invited to the debates, which meant that not enough time remained to litigate prior to the debates being held. See id. at 628. It is ironic that the very rationale which the majority used to grant Nader standing should now (I believe) lead them to find mootness. Under the majority's new standing jurisprudence, Nader could have brought his suit at any time after announcing his candidacy and possibly before doing so. A future petitioner who faces this same strategic problem will have ample time to sue in a manner so that we can redress his injury if appropriate.

Moreover, the procedural history of this case indicates that future cases in which standing arises will not necessarily evade our review. Nader's complaint was filed on June 29, 2000. However, oral argument was not until six weeks later, on August 14, 2000. The argument was delayed by both the recusal of the original assigned judge and by at least one unopposed motion to extend time (made by the FEC). Although the district court

issued its Memorandum and Order relatively quickly, on September 1, 2000, two more weeks passed until a final judgment was entered on September 18, 2000. This Court granted expedited review and oral arguments were heard on October 5, 2000. Although we have not issued our opinion until now, we certainly could have done so with more alacrity if it had proved necessary. Given the procedural history of this case, it can hardly be said that an Article III case or controversy on the issues raised would not be capable of full litigation and appellate review in a sufficient time to prevent mootness.

This case should never have reached the merits of the challenge to the FEC regulation. Nader lacked standing, either because his injury was hypothetical, or because his injury, although potentially real, was not traceable to the challenged regulations and not redressable by the invalidation of the challenged regulations. Moreover, by the time the litigation reached this court, Nader's harm had become moot. Although I agree with the majority that this appeal should be dismissed, I would not have reached the merits.